Donald H. Murphy, Plaintiff and Counterdefendant-Appellant, *v.* Joan C. Murphy, Defendant and Counterplaintiff-Appellee.

(Nos. 60295-96 cons.;

First District (5th Division)—August 8, 1975.

*Rehearing denied September 9, 1975.*

322

Jerome Berkson and Beermann, Swerdlove, Woloshin & Barezky, both of Chicago (Miles N. Beermann, of counsel), for appellant.

Irving Goodman and Louis Z. Grant, both of Chicago, for appellee.

Mr. PRESIDING JUSTICE BARRETT delivered the opinion of the court:

Plaintiff, Donald Murphy, filed an action for divorce in 1972 against his wife, Joan Murphy, alleging as ground thereof defendant's habitual drunkenness. Defendant filed an answer denying plaintiff's charge, alleging certain affirmative matter tending to show plaintiff's misconduct. Defendant also filed a counterclaim wherein she alleged as grounds mental cruelty, and a supplement to her counterclaim adding the ground of adultery. A second supplement was filed alleging extreme and repeated physical cruelty.

For greater clarity and ease of reading, the plaintiff-counterdefendant shall henceforth in this opinion be referred to only as plaintiff and the defendant-counterplaintiff will be referred to only as defendant.

A lengthy trial was had after which the trial court entered a judgment of divorce for defendant, finding that plaintiff had failed to prove his charge of habitual drunkenness; that plaintiff was guilty of physical and mental cruelty, and that the custody of the minor children should be awarded to defendant. The judgment for divorce contained other provisions mostly regarding money and property. All will be treated within this opinion. Plaintiff had been permitted to have custody of the three oldest children throughout the trial. On petition of defendant, the trial court subsequently found plaintiff in willful contempt for refusing a visitation right and sentenced plaintiff to serve 5 days in the Cook County Jail.

Plaintiff takes this appeal from the judgment for divorce and finding of contempt and presents seven issues to this court for review:

1. Whether the ruling of the trial court that the plaintiff-husband failed to prove his charge of habitual intoxication is contrary to the manifest weight of the evidence.

2. Whether the defendant failed as a matter of law to establish that her unconscious, semiconscious, and disoriented condition at numerous times was due to "hypoglycemia."

3. Whether the trial court erred as a matter of law in permitting defendant to file a supplement to the countercomplaint for divorce adding the additional ground of physical cruelty at the close of her case.

4. Whether the ruling of the trial court that the plaintiff is guilty of mental and physical cruelty as charged is contrary to the manifest weight of the evidence.

5. Whether the ruling of the trial court that the defendant is a fit and proper person to have the care, custody, control and education of the minor children of the parties is contrary to the manifest weight of the evidence and contrary to the best interests of the children.

6. Whether the findings and decretal provisions contained in the judgment for divorce relating to the marital home, plaintiff's insurance trust, plaintiff's income, and defendant's needs and the award of attorney's fees to defendant's attorney are erroneous and should be reversed.

7. Whether the order holding plaintiff in contempt of court was erroneous because of the failure to grant plaintiff a change of venue; because of the fact that the temporary order that plaintiff allegedly violated had been superseded by the provisions of the judgment for divorce; and because plaintiff's conduct was not wilful or contumacious.

Because in oral argument both sides accused the other as slanting the testimony of witnesses in their brief, we have carefully reviewed the 3,000 page record in this matter and herein summarize the testimony of each witness as we analyze it.

The following witnesses testified on behalf of the defendant:

*Joan Murphy*

Defendant testified that in August, 1971, she had been in a "coma" like state and had herself admitted to the Little Company of Mary Hospital to have tests performed. She stated that "I wanted to find out what was causing the problem within my system * * * I felt there was something physically wrong with myself." Defendant denied that she was intoxicated on July 7, 1972, but rather that she went to sleep early because she was tired. However, she said the following day plaintiff had to put her into the shower after having found her lying on the floor at the foot of her bed. Several weeks thereafter, defendant went on a Caribbean cruise with plaintiff and the children.

Defendant testified that Dr. Lowney prescribed an anti-depressant called Elavil after she began seeing him in January, 1972. On September 2, 1972, she did some drinking at 11 p.m. and went to bed at midnight, at which time she lapsed into a "coma." This lasted until September 4, 1972, with the exception of a period of time on September 3, 1972, when defendant went downstairs and fell and injured herself and was carried up to bed. Defendant said that she went into a "coma" four or five times in 1971, and the same number of times in 1972. She did not think that she was intoxicated when she spoke with Mary Selvaggio on the phone during the summer of 1971.

In testifying as to her mental and physical condition, defendant said that her nervous tension was caused by plaintiff's treatment of her. From September, 1970, defendant said that plaintiff's hours became very irregular and erratic and that plaintiff said that he was seeing a lot of Terri Graff for business reasons. In March of 1971, plaintiff went to a Boss Night with Mrs. Graff after which he came home at 5 a.m. completely intoxicated and full of lipstick. Defendant said that this incident made her very depressed and upset. On occasions plaintiff would leave for a period of 4 or 5 days and defendant would not know of his whereabouts.

Defendant testified that toward the latter months of 1972, she had a great deal of nervous tension and complete and utter exhaustion to the point "where I thought I was dying." Defendant said she had no craving for intoxicating beverages, and when she did have a drink she would because plaintiff kept after her saying it would relieve her nerves, and that he continued making the demands after she started taking medication. "I took it [the drink] because I had to or else get cracked and have it thrown in my face * * *" said defendant.

Defendant testified that on December 1, 1972, she came home and found plaintiff partying with the Graffs. The Graffs and plaintiff verbally abused her, and plaintiff gave her a vicious shove and would not let her go upstairs to bed. The incident resulted in plaintiff calling the police. Defendant stated that that same month she was attempting to prepare breakfast for the baby when plaintiff came into the kitchen, took the baby's egg and threw it on the floor. As she made another egg, plaintiff took it, and with soap suds from the kitchen, smeared it into defendant's hair. As defendant fled out of the house, plaintiff came up behind her and pounded her on the back of the head.

On January 3, 1973, plaintiff closed the bedroom door and started harassing and hitting defendant. That night plaintiff came home at 11 p.m. and awakened her, spit in her face and was intoxicated. Defendant says that she did not give plaintiff any cause to so conduct himself. On

January 6, 1973, plaintiff took defendant's purse away from her. As she asked him to return it, he started beating her head with his fists. Again on February 22, 1973, he struck and beat her in the face with his fists and kicked her on her legs and knocked her against the wall. Defendant proceeded to flee the home. She testified that she did not provoke plaintiff's actions.

Defendant and the baby attempted to visit the children on March 11, 1973, at which time plaintiff called defendant a filthy pig in front of the children. "He also said * * * he would rather see them dead than ever let me bring them up."

On September 23, 1973, plaintiff gave defendant a shove and as she tried to balance herself with her hand he stomped on her hand with his foot. Defendant said the pain was unbearable and that she had to go to a hospital to have her hand cleaned and bandaged. One week later plaintiff brought the baby back from visitation, at which time defendant noticed severe lacerations and bruises on the baby's head at the hairline. She subsequently brought him to the hospital for x-rays. She testified that a Hazelcrest policeman was present at the time plaintiff returned the baby because since the incident the previous week, a policeman comes on Friday and Sunday when the children are brought and picked up.

She said that her mental and physical condition has definitely and decidedly improved since she has not been living at home. She has not been nervous or depressed since the separation and she ceased taking medication entirely at the end of 1972.

*John F. Lowney, M.D.*

Dr. Lowney began treating defendant in January, 1972 and has seen her once a week to the date of his testimony. The doctor stated that his diagnosis of her would be that of reactive depression. He prescribed Elavil and Librium, an antidepressant and an antianxiety drug respectively. Dr. Lowney testified that "In my opinion, Mrs. Murphy has none of the stigma of an alcoholic and there is nothing in my history and nothing in my observations of her weekly visits to even consider her problem as being alcoholism. In addition, the testing as well as many interviews would indicate that she tends to get depressed." He went on to say that depression could be precipitated by an unhappy home life and that, in fact, she mentioned many times that plaintiff would be out most of the night, that he has a temper and that he was hard on the children.

Dr. Lowney testified that the inserts that are put into certain drug packages warn that one should not drink when taking Elavil and Librium. The tranquilizers, he stated, reinforce the effect of alcohol and could

induce intoxication. Dr. Lowney said that taking everything into consideration he would consider her a fit and proper person to have the care and custody of the children.

*Edgar G. Wigant, M.D.*

Dr. Wigant testified that he treated defendant in 1971, 1972 and 1973 for anxiety and depression and that she had the appearance of being haggard, fatigued and anxious. Dr. Wigant said that he never saw her in a condition involving drinking, though she had told him that she went into a "coma" after she had consumed alcoholic liquor while taking Librium. Dr. Wigant gave her a test for hypoglycemia, and found a "very mild hypoglycemia, not of any great clinical significance."

Dr. Wigant testified that she came to his home on the evening of January 25, 1973, that he examined her, and that she had evidence of contusions, bruises, ecchymosis and swelling around the face and jaw. He did not smell liquor on defendant's breath. He again saw her on either February 23 or February 24, 1973. He identified certain pictures at the trial as being of her face on that particular date. The doctor examined her and found an area of swelling and ecchymosis and contusions around the left eye and on the left cheek and over the right cheek an area of contusion and ecchymosis.

As her family physician, and from his personal experience and knowledge, he would not diagnose her as an alcoholic. Her depression was not the result of alcoholism and in his opinion it was not necessary for her to join Alcoholics Anonymous. She joined more for the support, he thought, than for the need. Dr. Wigant testified that Librium and Elavil and one drink could give a person the appearance of being drunk or intoxicated.

In testifying as to the appearance of the children, Dr. Wigant stated that they were very well dressed, very clean, cared for, well-behaved children. He has received telephone calls regarding the children's health, and has seen them at the office. "She seemed to be very concerned about her children, and a very good mother."

*Jean Bickel*

Jean Bickel testified that she holds Alcoholics Anonymous meetings in her home and that defendant has been attending meetings for 6 months. Mrs. Bickel stated that those people who join AA do not want to drink and want help so they will never have to drink. She said that she has never seen her drink and could never call her an alcoholic. Mrs. Bickel said that she believes she is capable of taking care of her children.

*Stephen Terrien*

Mr. Terrien testified that he is defendant's brother and that in May, 1970, he and his father picked up defendant and the children at a gas

station because she was extremely tired and depressed. There was no liquor on her breath. He testified that she did not want to return home with plaintiff, because he was out constantly in the evenings quite late. She felt that he was running around with another woman and that this was putting her in such a bad state of mind that she was afraid she would not be able to go on.

He further testified that he saw her on Thanksgiving Day, 1971, and that she was sober on that occasion. The children were neat and clean and very well mannered. He saw her again in July, 1972, and on Christmas, 1972, and that she was sober on both occasions. He said he noticed a considerable change in her physical and mental behaviour within the last 6 months, in that she has been quite a bit more talkative, outgoing and happier.

*Harriet Jan Koviak*

Harriet Jan Koviak testified that she has known defendant for 10 years and has stayed in her home for a period of time after the birth of her children. The last time she stayed in the Murphy home was in 1971 for about 3 days. She testified that defendant kept a "very immaculate, well organized home, one of the best I have ever been in." She stated that she has never seen her intoxicated, nor has she found empty whisky bottles around the house. She has seen her very sleepy and tired. She said that defendant took very good care of the children—their clothes and everything—and that they would be very clean. In her opinion, she is a good mother. She testified to seeing plaintiff come home at 1 or 2 o'clock in the morning.

*Rachel Fisher*

Rachel Fisher testified that with the exception of several months, she has seen defendant on an almost weekly basis from the summer of 1970 to June, 1972, and twice a day since Labor Day, 1972. She has never seen her intoxicated during those visits. On occasion, however, she observed her to be extremely exhausted and very depressed. She testified that in December, 1970, she saw another woman sitting in plaintiff's car very close to him, and again in the fall of 1971 she saw both, sometime after 10 p.m. at Henrici's Restaurant. She said that only at trial did she again see the other woman and learn her name to be Terri Graff. She said that she would be visiting with defendant and see plaintiff come home in the early morning hours.

She further testified that she saw defendant on January 24, 1973, at which time she brought her to the Fisher home. She had bruises on her body, and the witness stayed up until 3 p.m. administering ice packs. Fisher identified those bruises and marks from pictures of her introduced into evidence. She again took her into her home on February 22, 1973,

at which time she observed that her lip was swollen and that she had bruises on her face. On neither occasion was she out of the presence of the witness from the time she picked her up to the time the bruises appeared. She stated that she learned from defendant that she was a member of Alcoholics Anonymous and that she said she went to meetings because plaintiff had been calling her an alcoholic and she wanted to find out what an alcoholic really was.

She further said that she has recently seen defendant and that "she is no longer fearful, she is alert, she is back to the girl I knew back in 1958 for the first time. She is functioning, she is thinking, she is capable of handling herself, she is confident in herself; she feels she can face the world and stand on her own two feet * * * She is very capable of raising those children."

*Louis Braun*

Mr. Braun is a photographer who testified that defendant came into his studio on February 23, 1973, at which time he took a picture of her face. The trial court admitted the pictures into evidence for the purpose of showing her condition on February 23, 1973.

*Hubert Bumgarden*

Mr. Bumgarden was employed by defendant as a private investigator in order to place plaintiff under surveillance. He testified to having observed the plaintiff and Mrs. Graff together on numerous occasions at various restaurants and lounges and at the Graff home at night. He stated that on October 14, 1972, plaintiff left the Ground Round Restaurant with Mrs. Graff at 5:53 p.m., at which time they entered plaintiff's car and kissed for a period of 5 minutes.

*Joseph A. Mass*

Mr. Mass testified that he saw the Murphys on September 23, 1973, at about 6 p.m. at the swimming pool in his apartment complex. He stated that she walked toward plaintiff and put her suitcase down, at which point "plaintiff went after her, bumped her and knocked her down * * * as she was picking up the cigarettes, he stomped with his foot on her hand, took his foot and stomped * * * he stomped on it hard." Mass said that he saw nothing she did to provoke plaintiff's conduct.

*Mary McCarty*

Mary McCarty has known the Murphys for about 13 years, and during that time has never seen her intoxicated. She saw her in March of 1970, as she was preparing to drive to Milwaukee for Easter. Though she seemed depressed, she was not intoxicated. She came to the witness' home on a Friday night in February, 1973 "* * * and she had been badly beaten. Her lip was all swollen out, her face was bruised * * *."

She testified that she accompanied her to the Murphy home on April 1, 1973, but that plaintiff hindered her visitation with the children and verbally abused her in front of their 10-year-old son Pat. Since Labor Day, 1972, she is more self-confident, no longer depressed, more alert, more like she used to be in the earlier years. In Mary McCarty's opinion, she is a fit and proper person and is qualified to have the care and custody of the children.

The following witnesses testified on behalf of the plaintiff:

*Donald Murphy*

Plaintiff testified that his wife started drinking in the spring of 1969 to the point of being unable to get up from bed mornings. It was at that time that he began finding bottles of liquor hidden around the house. In March of 1970, she attempted to drive to her parents' home in Milwaukee with the three Murphy children, but got no further than a gas station in Chicago from where the attendant called her parents, who proceeded to pick her and the children up. He testified that the baby was born on February 24, 1971, and the day she was to deliver she was drunk. He testified further that the family drove to Milwaukee for Thanksgiving in 1971, and that she was fine, but as soon as they returned to Chicago she started to drink and passed out. In January of 1972, she was intoxicated for a period of 2 weeks, with the exception of the day before Christmas and New Year's Eve, and would frequently be found wandering around the house on her hands and knees. He stated that on one particular occasion, she picked up the back end of her nightgown and urinated all over the rug, right in front of the children. During the 1972 Labor Day weekend, the Murphys gave a party at which she became intoxicated. Plaintiff said that she was unable to care for the children; that they were scared of her and that they were unable to have any of their friends in because she would embarrass them. He said he transported her to the Tinley Park Hospital where the initial diagnosis indicated that she was suffering from acute alcoholism. He said that he had told her many times that a mixture of alcohol and antidepressant drugs were bad for her. Plaintiff said he believes that such a mixture intensifies the effects of alcohol.

Plaintiff testified that he has known his dental assistant, Terri Graff, for 10 years. Plaintiff denied kissing Mrs. Graff in an automobile while he was alone with her, or being full of lipstick. It is possible, he said, that he was with her on October 6, 1972, from 10:30 p.m. to 1:20 a.m. in a cocktail lounge having a drink, though he was not with Mrs. Graff at the Casa-Silver Lounge on September 28, 1972, at 10:30 p.m. He denied that he would leave the home for 3, 4 or 5 days at a time between 1966 and 1973 without telling his wife where he was going. He would come

home late only when he had to work late at the office. Since January, 1973, while he had sole possession of the children, he has never left them unattended. He said that he has both a housekeeper and high-school girls to help around the house.

### Herbert Wustmann

Herbert Wustmann, an uncle of the plaintiff, testified that he saw defendant lying on her bed in a stupor on July 7, 1972, and that she could not comprehend what he was saying. Though there was a strong odor of liquor, the witness saw no evidence of liquor in the bedroom. When he returned to the Murphy home after dinner, he observed her lying on the floor in a fetal position, exposed from her brassiere to her knees. He testified that the next day she was again intoxicated and that he and Mrs. Wustmann helped to put her into the shower. He stated that on that day he saw liquor bottles around the house. He again saw defendant intoxicated on August 15, 1972.

He testified that she did not become intoxicated at a wedding which they attended in California in February, 1972, nor was she intoxicated during the 7 days that she spent in the Wustmann home in Chicago. Moreover, he stated that he has seen her intoxicated only about five times during the 15 years that the Murphys had been married. In his opinion she has not been a fit and proper mother.

### Luvella Wustmann

Mrs. Wustmann testified that she knew defendant since her marriage to plaintiff. She has visited the Murphy home about four or five times a year. She testified that she saw defendant on July 7, 1972, at which time defendant was "incoherent, smelled of alcohol, just in a stupor." She noticed a puddle on the kitchen floor which plaintiff said that was where she had urinated. She again saw her "drunk" on July 8, 1972. The witness said that she spoke with her on the telephone on August 18, 1972, and the week following, at which time she urged her to join the Alcoholics Anonymous to straighten herself out. She said that she replied "And then I want to go teach." She further stated that when she stayed at their home in 1971, she admitted that she drinks, and that she told her "there is nothing much else to do, Don is gone," and that she drinks at night because she can't sleep. The witness testified that she did see her intoxicated at the California wedding which she and Mr. Wustmann had attended. In her opinion, defendant is not a fit and proper mother.

### Richard Moutvich, M.D.

Dr. Moutvich has known the plaintiff since 1956, and the defendant since about 1962. He saw her on January 27 or January 29, 1972, at which time she seemed incoherent, her gait was unsteady and she had

a smell of alcohol on her breath. She had slept through most of dinner at a restaurant. Dr. Moutvich testified that he saw her again in August, 1972, at the Olympia Fields Country Club. Though she did some drinking that day, she was perfectly normal. Dr. Moutvich stated that it is possible, depending on the individual and the dosage, that a person taking Librium or Elavil, and a drink or two, could appear intoxicated, seem glassy-eyed and incoherent.

*William Slavin, M.D.*

Dr. Slavin testified that he has known the Murphys for 13 years and has been out socially with them. In January, 1972, he sat next to defendant at a basketball game and observed that she had trouble speaking at times, that she staggered and that she smelled of alcohol. The witness said that he has seen her intoxicated on one other occasion, that being in February or March, 1972, at which time she walked to his car in her nightgown though there was snow on the ground. Dr. Slavin testified that over a period of a year or two she called him at his residence 20-25 times at 1 a.m. and during those times complained about her way of life. "On quite a few of those times she sounded to me like she was drunk or was drinking." The witness stated that she had complained to him about being alone and about the fact that plaintiff was going out with other women. He believed she was depressed. He testified that the mixture of Librium or any other tranquilizer, with liquor, could cause incoherency, glassy-eyes and either semiconsciousness or unconsciousness.

*Victoria Pillman*

Victoria Pillman was employed by plaintiff as a dental assistant and lived in the Murphy home for a period of 2 weeks in May, 1972. During that time she had seen defendant intoxicated on three occasions, and observed her in bed for a period of 3 or 4 days. One night when the witness wanted to take a bath, she found a bottle of liquor underneath a towel in the linen closet. On another occasion she observed her attempting to feed the baby, but was unable to do so because she was drunk. She testified that on one occasion she saw her intoxicated in the greenhouse.

*Millicent Ames*

The witness testified that she is a dental assistant in plaintiff's office and has seen defendant in the office 40 to 50 times since 1970. She stated that she took x-rays of her on May 11, 1971, and noticed an odor of alcohol on her breath, that she was glassy-eyed, slurred her speech and walked in an uncertain way. The witness stated that she saw her in the office in an intoxicated condition again on April 16, 1972. She said that on August 6, 1971, she assisted plaintiff in an attempt to take

her to the hospital. At that time she was drunk, stammering and incoherent. She testified to having had 20 to 25 phone conversations with her, during many of which she was completely incoherent. She said that since 1970 plaintiff left the office at least 10 times to go home and bring the children to the office. She considers her unfit to have the care of her children.

*Mary Selvaggio*

Mary Selvaggio is plaintiff's sister and has known defendant since they attended college together. The witness testified that after the birth of the defendant's baby in March, 1971, defendant would call her almost every week, very often at odd hours, and would be incoherent. Mrs. Selvaggio stated that she told her that she found it hard at times to cope with the children. On July 29, 1971, she called Mrs. Selvaggio and asked to be brought to the Selvaggio residence for a couple of days "because she had been drinking very, very much." She testified that on that day defendant was very sick looking, her eyes bloodshot and she stammered. She said that she told her "My life is a mess. I have to get myself back together again." During the week preceding Christmas, 1971, the witness said she had 20 telephone conversations with defendant, during some of which she would cry and say that she had been drinking. She would hang up abruptly and call again, repeating the same conversation. The witness saw defendant on Easter Sunday, 1972, at which time she looked haggard, seemed very weak, her eyes bloodshot, and her face puffy. During that particular visit, she observed bruises on her arms and legs and she said she had fallen and bumped herself. On that occasion she told her that "I have this problem and I black out when I drink and I shouldn't drink. Actually, I try not to." Mrs. Selvaggio further testified that she has seen defendant intoxicated only twice in the last 2 years, at which time she had blacked out and come to. It is her opinion that she is not a fit and proper person to have the custody and control of the children.

*Immaculate Copagnoni*

The witness has been employed by plaintiff as a bookkeeper and receptionist since January, 1972. She said that she has spoken with defendant on the phone between 25 to 30 times within the last year. On several occasions, when she called the office, Miss Copagnoni said that she "seemed to be in a very depressed mood * * * at times forgetting who she was talking to and started to relate some of her problems to me * * * ." Out of the 25 to 30 times that she came into the office, half of those times she would be disheveled, appeared to be glassy-eyed, had liquor on her breath and walked wobbly. On 10 to 15 occasions plaintiff went home and brought the kids back to the office.

*Lettie Cole*

Lettie Cole testified that she was employed as a housekeeper at the Murphy home on February 23, 1973. Defendant came to the house at about noon, at which time the witness observed her face and arms. She said that she saw none of the marks or bruises on her that are portrayed in the pictures admitted into evidence. Defendant left the home at 3 p.m. and was not seen again by the witness before she left her duties at 6 p.m.

*Terri Graff*

Terri Graff testified that she has been employed by plaintiff as a bookkeeper assistant for 9 years. In June, 1972, the witness and plaintiff went to plaintiff's home where she saw defendant lying on the living room floor with her nightgown up around her neck. The smell of alcohol was very present and the children were running around the house at will. Mrs. Graff testified that on September 3, 1972, she attended a party at the Murphy home where she observed defendant stumble and fall to the floor where she laid and closed her eyes as if she were sleeping.

Mrs. Graff testified that she has never committed adultery with plaintiff or anyone else. Mr. Graff and plaintiff are very good friends. The witness said that on one occasion she was at Dominick's Restaurant at 1 a.m. with plaintiff, but without her husband, who called to say he could not meet them. In her opinion, plaintiff is an excellent father to his children.

*Allen Robert Graff*

Mr. Graff testified that he is the husband of Terri Graff and has known defendant for about 10 years. Mr. Graff testified that on January 4, 1972, he helped plaintiff take her to the Tinley Park Hospital. On that occasion he observed her lying in the front vestibule, unable to stand up. Her eyes were glassy and speech was slurred. She smelled of alcohol. He saw her drunk again on September 3, 1972.

The witness further testified that he knows his wife has gone to restaurants with plaintiff and that he has at times joined them. On October 5, 1972, he was at the Lincoln Inn with his wife and plaintiff, at which time they sat at the bar and watched a football game. Thereafter they all went to the Graff residence. He knows of only one occasion where plaintiff and Mrs. Graff were at a restaurant without him. He said that he has no doubt of the fidelity and loyalty of his wife.

*Sister Thomas Annette*

Sister testified that she is the principal of the school in which the Murphy children are enrolled. She said that she is aware that Patrick Murphy has been in the custody of plaintiff since the spring of 1973.

Patrick since that time is a more adjusted child—less tense—more at ease. He is a good student, well nourished and clean. All the Murphy children seem happy and well adjusted. They have a normal relationship with the plaintiff. Sister Annette also testified that on one occasion in 1972, defendant came to school to have the children released early for the Thanksgiving Holiday and that Patrick reacted strongly and asked permission to call his father. She stated that she has seen an improvement in defendant's appearance in 1973 over her appearance in 1972. In her opinion as a principal and former teacher, defendant was interested in the welfare and progress of her children.

*Charles E. Bingam*

Police Officer Bingam was called to the Murphy residence on December 1, 1972, at 10:45 p.m. because of a reported disturbance. The policeman said he found no disturbance at the home, though defendant had asked him to remove plaintiff so she could get some sleep. Though she was highly excited, the officer could see no marks or bruises on her body.

*Tom Paoletta*

Police Officer Paoletta was called to the Murphy residence on February 22, 1973, at 9 p.m. Officer Paoletta testified that defendant feared for her safety and wanted the police to accompany her into the house so that she could pick up some personal belongings. He did not observe any marks or bruises on her body at that time.

*Dolores Moutry*

Dolores Moutry testified that she worked for about 4 or 5 years in the Murphy household. On one occasion in October, 1971, Mrs. Moutry found a bottle of whiskey under defendant's bed. At that time she was in bed "out" and there was a strong smell of liquor. The witness said she worked on Mondays and had seen her drunk every week for the 3 years that she had worked at the Murphy home in Olympia Fields. She later stated that in the 4 or 5 years that she has worked for the Murphys she has seen defendant intoxicated only three or four times. Mrs. Moutry testified further that she has seen her take care of the children and do the cooking and that she did a good job.

OPINION

■■ The first issue plaintiff raises on appeal is that the ruling of the trial court that plaintiff failed to prove his charge of habitual drunkenness is contrary to the manifest weight of the evidence. In determining whether the trial court's finding is correct, we apply the definition of habitual drunkenness as has been defined by our supreme court to mean "an irresistible habit of getting drunk; * * * a fixed habit of

drinking to excess; * * * an involuntary tendency to become intoxicated, which is acquired by frequent repetition,—such a frequent indulgence to excess as to show a formed habit and inability to control the appetite." *Garret v. Garrett*, 252 Ill. 318, 326, 96 N.E. 882.

This court by applying the above definition to the testimony in the instant case must hold that the finding of the trial court, that defendant was not an habitual drunkard under the Illinois Divorce Act (Ill. Rev. Stat. 1973, ch. 40, par. 1), is not against the manifest weight of the evidence. We fail to find, as did the trial judge in this case, that defendant has a fixed habit of drinking to excess to the point that she cannot control her appetite.

Rachel Fisher testified that, with the exception of several months, she has seen defendant on an almost weekly basis from the summer of 1970 to June, 1972, and twice a day since Labor Day, 1972. She has never seen defendant intoxicated during those visits. Mary McCarty testified that she saw defendant as she was about to depart with her children for Milwaukee on Holy Saturday in March, 1972, and that defendant was not intoxicated. Victoria Pillman lived with the Murphys for 2 weeks in May of 1972, and saw defendant intoxicated on three occasions during that period. Harriet Jan Koviak stated that she stayed at the Murphy home after the birth of the children and again for 3 days in 1971, and has never seen defendant intoxicated during that time. Millicent Ames testified that she saw defendant intoxicated on May 11, 1971, and again on August 6, 1971, and April 16, 1972, although defendant had called the office many times in 1970, and spoke in an incoherent manner. Mary Selvaggio stated that she saw defendant intoxicated only twice in the last 2 years. Immaculate Copagnoni testified that one half of the 25 to 30 times that defendant came into the office she would be glassy-eyed and have liquor on her breath. Terri Graff saw defendant intoxicated in June of 1972, and again on September 3, 1972. Allen Graff saw defendant intoxicated on January 4, 1972, and on September 3, 1972. Dolores Moutry testified that in the 4 or 5 years that she has worked for the Murphys as a housekeeper she has seen defendant intoxicated only three or four times. Stephen Terrien said defendant was not intoxicated when he picked her up at a gas station in May, 1970. Plaintiff testified that defendant was intoxicated in February and November, 1971, for a 2-week period around January, 1972, on the July 4, 1972, weekend and during the Labor Day, 1972, weekend. Luvella Wustmann and Herbert Wustmann testified that they saw defendant intoxicated on July 7 and 8, 1972, but Mr. Wustmann, plaintiff's uncle, stated that he has seen defendant intoxicated only five times

in the 15 years plaintiff and defendant have been married. Defendant stated that she went into a "coma" in August, 1971, and went into the hospital for tests. She denied being intoxicated on July 7, 1972, but admits lying on the floor the next day. She did some drinking on September 2, 1972, and lapsed into a "coma" thereafter. She went into a "coma" four or five times in 1971, and again in 1972. Dr. Lowney testified that he had been treating defendant for 10 months and would say that defendant has none of the indications of an alcoholic. The Librium and Elavil he prescribed could reinforce the effects of alcohol. Dr. Slavin said the mixture of liquor and tranquilizers could cause incoherency, glassy eyes, either semiconsciousness or unconsciousness. Dr. Moutvich saw defendant intoxicated on January 27 or 29, 1972, but that it is possible that Librium or Elavil and a drink or two could make an individual appear intoxicated. Dr. Wigant treated defendant for anxiety and depression in 1971, 1972 and 1973. He would not diagnose defendant as an alcoholic. He testified that Librium and Elavil and one drink could give a person the appearance of being drunk or intoxicated.

■■ It has long been the law in this State that it is within the province of the trial court to determine whether there has been sufficient evidence with which to establish either party's contentions. In the instant case the trial court heard the evidence, viewed the witnesses, had an opportunity to observe their demeanor and to judge from their appearance and actions the credibility of their words, and was thus in a better position to conclude the issues. The trial court's findings are presumed to be correct (*Gillespie v. Gillespie*, 70 Ill.App.2d 38, 216 N.E.2d 462), and this court will not set aside its findings and judgment unless the decision reached by it is against the manifest weight of the evidence. *Hayes v. Hayes*, 117 Ill.App.2d 211, 254 N.E.2d 288; *Hoffman v. Hoffman*, 40 Ill.2d 344, 239 N.E.2d 792.

■■ Plaintiff argues that it is apparent that the trial court denied him a divorce on the ground of habitual drunkenness because it mistakenly attributed defendant's "comatose state" to hypoglycemia. Finding Number 10 in the judgment of divorce, however, clearly demonstrates that the trial judge relied on testimony that the mixture of alcohol and tranquilizers could create the appearance of intoxication in finding * * * "that taking a drink or two with this condition [hypoglycemia], having taken anti-depressant pills, may result in the patient's condition becoming dangerous or comatose." Neither can we agree that the court relied exclusively on the testimony regarding hypoglycemia as his sole basis for denying plaintiff a decree on the grounds of habitual drunkenness.

On the contrary, we believe the trial judge considered all of the evidence adduced by both parties and weighed it in favor of the defendant. This is a trial judge's right and obligation.

■■ The next issue plaintiff raises is that the ruling of the trial court that he is guilty of mental and physical cruelty is contrary to the manifest weight of the evidence. Plaintiff fails to address himself to the merits of the testimony with respect to the finding of physical cruelty. Instead, he alleges that the trial court committed error by granting defendant leave to file a supplement to her countercomplaint at the close of her case alleging plaintiff's physical cruelty. We find that plaintiff had sufficient time to prepare a defense to this allegation and that the trial judge clearly had the authority to allow the filing of the supplement under section 39 of the Civil Practice Act. (Ill. Rev. Stat. 1973, ch. 110, par. 39.) The trial judge has broad discretion with respect to the allowance of amendments and supplements to pleadings and this discretion is not abused unless clearly arbitrary and without foundation. *Rank v. Rank*, 107 Ill.App.2d 339, 246 N.E.2d 12.

Though plaintiff has not spoken to the merits of the testimony on physical cruelty, he does nevertheless raise the issue of the trial court's finding as being against the manifest weight of the evidence. Defendant testified that plaintiff shoved her on December 1, 1972, hit her on January 3, 1972, beat her with his fists on January 6, 1973, beat her with his fists in the face and kicked her in the legs on February 22, 1973, and shoved her and stomped on her hand on September 23, 1973. Rachel Fisher testified that she saw bruises on defendant's body on January 24, 1973, and again on February 22, 1973. Lettie Cole said she saw no bruises on defendant on February 23, 1973. In Illinois, two acts of physical cruelty resulting in pain and bodily harm committed on separate occasions constitute sufficient grounds for divorce. (*Tuyls v. Tuyls*, 21 Ill.2d 192, 171 N.E.2d 779.) Corroboration is not necessary in a contested divorce proceeding. (*Surratt v. Surratt*, 12 Ill.2d 21, 145 N.E.2d 594.) We feel that the judge's finding of physical cruelty was not against the manifest weight of the evidence.

■■ We will also not set aside the finding of the trial court that plaintiff is guilty of numerous acts comprising mental cruelty. This ground for divorce requires the complaining party to prove that the alleged acts of mental cruelty caused embarrassment, humiliation, and anguish so as to render life miserable and unendurable or caused the plaintiff's life, person or health to be endangered. (*Bilsky v. Bilsky*, 18 Ill.App.3d 329, 309 N.E.2d 697.) Whether certain acts constitute mental cruelty depend upon the total factual background surrounding the question which includes the emotional and personal makeup of the

parties and the circumstances surrounding the acts complained of. (*Hayes v. Hayes*, 117 Ill.App.2d 211, 254 N.E.2d 288.) A further essential element of proof to be established when a right of divorce is based upon mental cruelty is that there was a lack of provocation for the alleged acts of the plaintiff. (*Stanard v. Stanard*, 108 Ill.App.2d 240, 247 N.E.2d 438.) Applying these standards to the testimony offered at trial we believe that the trial court's finding as to mental cruelty is not against the manifest weight of the evidence. Defendant testified that plaintiff's hours became very erratic and irregular and that plaintiff said he was seeing Terri Graff for business reasons. Plaintiff came home in March, 1971, at 5 a.m. intoxicated and full of lipstick; plaintiff demanded that defendant drink to relieve her nerves, and that if defendant did not, she would "get cracked and have it thrown in my face"; plaintiff would leave for 4 or 5 days and defendant would not know of his whereabouts; plaintiff verbally abused defendant in front of the Graffs on December 1, 1972, and in front of the children. Harriet Koviak testified that during her stay at the Murphy residence she saw plaintiff come home during the early morning hours. Rachel Fisher said that she would be visiting with defendant and plaintiff would come home in the early morning hours, and further that she saw plaintiff with another woman in his automobile and in a restaurant. Dr. Slavin said defendant told him that plaintiff was going out with other women. Plaintiff testified that he told defendant each time he would go out of town; that it was possible that he was out with Terri Graff until early in the morning on October 6, 1972, but he denied being full of lipstick and stated he would come home late only when he worked late at the office. Allen Graff testified that he was home when plaintiff would come to his home. Terri Graff admitted being at a restaurant with plaintiff and that Mr. Graff called to say he could not meet them. Although there is conflict in the testimony, we find that the trial judge acted within his province to make the determination that there has been sufficient evidence to establish defendant's contention. This court will not set aside that finding.

■■ The next issue plaintiff raises is that the ruling of the trial court that defendant is a fit and proper person to have the care, custody and control and education of the minor children of the parties is against the manifest weight of the evidence and contrary to the best interests of the children. In considering the custody of minor children, the Illinois Supreme Court has said that "under our divorce statute the court is clothed with a large discretion in determining to which parent a child will be given." (*Nye v. Nye*, 411 Ill. 408, 105 N.E.2d 300.) The primary consideration of the court should be the best interests of the children (*Day v. Day*, 33 Ill.App. 2d 247, 178 N.E.2d 203), and the determination of the trial court of what

is in the best interests of the child should not be reversed unless it is clearly against the manifest weight of the evidence and it appears that a manifest injustice has occurred. (*Rosenberger v. Rosenberger*, 21 Ill. App.3d 550, 316 N.E.2d 1.) We do not feel that such a manifest injustice occurred here. Rachel Fisher testified that when she visited the Murphy residence she would see defendant do cooking and ironing. In her opinion, she is a good mother. Dr. Lowney said that taking everything into consideration he would consider her a fit and proper person to have the care and custody of the children. Immaculate Copagnoni and Mary Selvaggio both testified that defendant told them on the telephone that she has a difficult time coping with the children. Millicent Ames testified that plaintiff had to bring the children to the office on numerous occasions, and that she would consider defendant an unfit mother. Dr. Wigant testified that whenever he saw the children they would be very well dressed, very clean, cared for, well behaved. Herbert Wustmann and Luvella Wustmann believed that defendant would not be a fit and proper mother. Mary McCarty testified that since Labor Day, 1972, defendant is more self-confident, no longer depressed, more alert. Defendant is qualified to have the care and custody of the children. Mrs. Moutry testified that she has seen defendant take care of the children, do the cooking and that defendant did a good job. Sister Thomas Annette stated that Patrick Murphy seems to be a more adjusted child since he is in plaintiff's custdoy. All the Murphy children are happy and well adjusted. Defendant is interested in the welfare and progress of her children. Harriet Koviak testified that defendant has an "immaculate, well-organized home, one of the best I have ever been in." Defendant, in her opinion, is a good mother. In spite of some conflict in the evidence, we believe that the evidence supports the trial court's findings that it is in the best interests of the minor children that their care, custody and education be in the hands of the mother.

The next point plaintiff raises is that the finding and decretal provisions contained in the judgment for divorce relating to the "missing" $25,000, the marital home, plaintiff's insurance trust, plaintiff's income and defendant's needs and the award of attorney's fees to defendant's attorney are erroneous and should be reversed.

■■ The trial court stated in Finding No. 19 of the judgment for divorce that plaintiff did not account for approximately $25,000 and that the defendant should be provided with $10,000 from the sale of the marital home apparently to compensate for this "missing" sum. Plaintiff testified that he had taken a $55,000 construction loan and had subsequently repaid it from a $60,000 mortgage on the home. The findings of fact demonstrate that the trial judge misunderstood plaintiff's testimony for they refer to

a $35,000 construction loan repaid by the $60,000 mortgage—thus accounting for the "missing" $25,000. Since plaintiff's testimony clearly reveals that the construction loan was for $55,000, we deem it necessary to reverse decretal provision "M" ordering plaintiff to pay defendant $10,000.

■■ We affirm the decision of the trial court in decretal provision "P" that any land and/or insurance trust be terminated and that title to the marital home be placed in joint tenancy. The house in Olympia Fields was purchased in 1969, and title was initially held in joint tenancy. Subsequently, title was quitclaimed to the Harris Trust and Savings Bank as trustee and plaintiff as sole beneficiary and with sole power of direction. Plaintiff testified that he took this action because it would have been easier to take care of all the financial matters if they were in his name and furthermore, plaintiff said he worried that defendant would end up in a hospital forever. The house should be sold and the net proceeds divided equally as provided in decretal provision "J" and Finding No. 18.

■■ . Plaintiff asserts that the trial court's finding that plaintiff's income is about $40,000 to $42,000 is not supported by the evidence. He does not challenge the court's decree that he is to provide 50% of his net income for child support and alimony, but contends that the minimum $1,750 monthly payment to defendant is erroneous, since it is based on the court's miscalculation of his income. We agree with plaintiff. In reviewing his 1972 Federal income tax return we find that his income from all sources was $41,994, on which there was a net Federal income tax of $5,282, social security tax of $468 and State income tax of $1,075, thereby leaving an actual net income of $35,169. The trial court is directed to modify decretal provision "F" to conform to plaintiff's actual net income.

■■ The next point plaintiff raises is that there is no evidence in the record to support the trial court's findings as to the hours spent by defendant's attorney representing her interest or the value of the legal services rendered on her behalf. The law in this State is that the granting of attorney's fees is improper where no evidence is heard as to the items of service which were performed, or as to the basis of the amount requested or that such fees were reasonable for such services. (*Jones v. Jones*, 48 Ill.App.2d 232, 198 N.E.2d 195; *Dejoie v. Dejoie*, 6 Ill.App.3d 381, 286 N.E.2d 38.) Here the record discloses no such evidence. Accordingly, we reverse decretal provision "V" which allows defendant's attorney the sum of $16,250 and remand this matter to the trial court to hold such hearings as are necessary to determine the value of the services rendered by defendant's attorney.

■■ The next issue raised by plaintiff is that the trial court abused its discretion in finding plaintiff in contempt of an order establishing defendant's visitation rights with the three minor children in plaintiff's custody

and plaintiff's rights as to the visitation of the baby in defendant's custody because his conduct was neither willful, nor contumacious. We agree. The law is well settled that it is an abuse of discretion to hold a party in contempt for violating an order in a divorce matter unless the refusal to obey the order is both willful and contumacious. (*Wick v. Wick*, 19 Ill. 2d 457, 167 N.E.2d 207.) The unfortunate circumstances in the instant case, where direct communication between the parties broke down so that their attorneys had to be used as conduits for messages, and the belief of the parties that the inability to visit on one weekend, perhaps because of the illness of a child, precluded the reciprocal visit the following weekend, led more to feelings of mistrust and lack of understanding than willful or contumacious conduct on plaintiff's part. For this reason, the order committing plaintiff to serve 5 days in the county jail is reversed and in view thereof, we find it unnecessary to decide the two other issues raised by plaintiff concerning the contempt order.

Accordingly, we affirm in part and reverse in part and remand the cause to the trial court for further proceedings in accordance with views and directions contained herein.

Affirmed in part, reversed in part and remanded with directions.

LORENZ and SULLIVAN, JJ., concur.