ROSALYN GRAFF, Plaintiff-Appellee, *v.* ROBERT J. GRAFF, Defendant-Appellant.—ROBERT J. GRAFF, Plaintiff-Appellant, *v.* ROSALYN GRAFF, Defendant-Appellee.

First District (5th Division)    Nos. 76-1169, 77-864 cons.

Opinion filed April 12, 1979.

William Henning Rubin, of Chicago, for appellant.

Errol Zavett, of Perlman, Schulman & Bell, Ltd., of Chicago, for appellee.

Mr. JUSTICE WILSON delivered the opinion of the court:

On October 15, 1974, Rosalyn Graff (Rosalyn) filed a complaint for divorce against Robert Graff (Robert) on grounds of extreme and repeated mental cruelty. (Ill. Rev. Stat. 1973, ch. 40, par. 1.) After a hearing, the trial judge entered a decree of divorce on August 31, 1976, which awarded Robert's interest in the marital home, owned in joint tenancy, to Rosalyn as alimony in gross. Upon sale, Robert would receive 20% of the net proceeds. It also contained a provision that if Robert failed or refused to transfer his interest to Rosalyn by quitclaim deed within 10 days, an associate judge of the land title division would execute a deed in his stead. Robert filed a notice of appeal on the same date as the entry of the divorce decree.

During the course of the divorce proceedings, Robert filed a separate action in the chancery division, seeking partition of the joint tenancy in

the marital home and naming Rosalyn and others as defendants. Rosalyn filed a motion to dismiss the action or alternatively to consolidate it with the divorce proceeding. Subsequent to the entry of the divorce decree, Rosalyn filed a motion to vacate or alternatively to transfer the cause to the divorce division on the grounds that the property in issue had been disposed of by the divorce court. After several continuances and also a change of judge pursuant to a motion by Robert's counsel, the court dismissed the cause for want of prosecution on March 1, 1977. Two days later, Rosalyn filed a motion for summary judgment attaching a deed dated December 3, 1976, and signed by an associate judge, conveying and executing Robert's interest pursuant to the divorce decree. The judge entered an order of dismissal on March 3, 1977, pursuant to Rosalyn's motion. The following day, the judge vacated the earlier dismissal for want of prosecution. On March 7, 1977, Robert moved to vacate the March 1, 1977, dismissal for want of prosecution and to vacate the order of summary judgment entered after the dismissal for want of prosecution. The judge denied these motions and sustained the "order of dismissal heretofore entered on March 1, 1977." Robert filed a notice of appeal on March 11, 1977. The two cases have been consolidated for purposes of this appeal.

Necessary to the disposition of this consolidated appeal is our resolution of the following issues: (1) Whether the trial judge in the divorce proceeding erred in finding Robert guilty of extreme and repeated mental cruelty toward Rosalyn, (2) whether the divorce court incorrectly continued its jurisdiction over the marital home after Robert filed his notice of appeal from that proceeding, and (3) whether the trial judge in the partition proceeding erred in ordering summary judgment in favor of Rosalyn. We affirm as to all three issues.

We first consider whether Rosalyn proved, by a preponderance of the evidence, that Robert was guilty of extreme and repeated mental cruelty. The evidence pertinent to this issue was adduced at trial as follows:

Rosalyn testified from her recollection and from notes that she had been keeping, that during their 20-year marriage, Robert would come home at 2 or 3 a.m. about four or five times a week and say that he had been working or at a meeting. Several times a week over a 15-year period, he would fail to call her or inform her that he would be late for dinner, although occasionally he would tell her where he could be reached. He had embarrassed her about 5 years before by blowing a whistle at a banquet that they had attended in Canada. He had blown the whistle at a wedding as well and on other occasions, but she could not remember the dates. She recalled an incident where he became intoxicated and passed out on their kitchen floor in front of another couple. On two occasions,

Robert engaged in shoplifting in front of the children and once he took towels from a hotel in spite of her efforts to put them back.

Rosalyn further testified to various acts of anger or threats by Robert without any provocation on her part. Over 20 years of marriage, he would shout and scream once every week or two. The previous May, she asked him if they could settle without long litigation. He began throwing chairs around, and throwing articles on the floor. He told her he would kill her and her attorney and she called the police. In October, he became angry at his wife after their daughter woke him, and he ran around the house nude. In September, he began screaming after she asked him not to wash the family's clothes. In January and February of 1975, he asked her to lend him money and when she refused, he threatened her that he would see to it that she lost her job. He threatened her with the loss of her job on another occasion as well and told her in front of one of their daughters that they would lose their house and file for bankruptcy. Although it is unclear whether it was then or at another time, Robert told one of their daughters to look up bankruptcy because they were headed for it. She and her daughter walked away and Robert ran after them and accused them of talking behind his back. In February, in front of her daughter and her daughter's friend, he threatened to drag Rosalyn's family into the divorce and to never let her have a divorce. On another occasion he told her that he hoped the proceeding would kill her father and asked her for $25,000. In April of 1974, he said that he would burn the house down before he would let her remain in it.

Several times a week for the duration of the marriage up until a year before the trial, Robert refused to close the door of the bathroom adjacent to their bedroom while he was using it, despite Rosalyn's objections. Rosalyn recalled an incident where their youngest child walked in and her husband became angry. Robert was also careless in his dress and often failed to close his robe or undergarments adequately. She also testified that Robert told her in front of their two younger children that she was crazy. On another occasion, again in front of one of their children, he told her she was lucky he did not force her to "peddle [her] ass for money" and wondered whether she was having sexual relations with men, women and children.

Rosalyn further testified to a number of incidents where her husband was late, causing her to miss a wedding ceremony and to be late for various parties and celebrations. On two occasions, they were entertaining family or friends at home and Robert arrived late and further delayed the meal by attending to various chores while their guests were waiting.

Robert told her in October of 1974 that he never wanted her parents in their house again after he had had an argument with her father. On

January 9, 1974, he refused to get dressed when his daughter's friend was coming over to visit. On another occasion, Rosalyn accidentally got oven cleaner in her eye, and Robert persisted in nagging her, while she was in pain, to sue the manufacturer or to ask her father for money.

Rosalyn further testified that Robert paid $240 of their daughter's $3,000 first year college tuition. For several years, Rosalyn had been paying the charge account bills and doctor's bills out of her earnings, although Robert paid for food. Her husband threatened to take in a boarder to defray expenses. After the commencement of the divorce proceedings Robert showed their house to prospective buyers over her objections.

Rosalyn further stated that she observed the Jewish Sabbath for the first 17 years of their marriage at her husband's insistence but had stopped for the past 3 years. Their daughter needed money for college and took a job which required her to work Friday night and Saturday in violation of the Sabbath laws and Robert strenuously objected. The daughter has a nervous stomach and as a result of Robert's objections had been crying and losing sleep and so had Rosalyn.

Rosalyn testified to other effects her husband's behavior has had on her. For the past 2 years, she had been nervous on the job and often close to tears. Her efficiency at work was especially impaired following incidents at home. She was diagnosed 8 months before as being afflicted with Raynaud's disease, which is brought about by mental strain. The symptoms are that her hands become cold, and mottled and discolored in appearance, and her fingernails turn blue. She had been suffering from nervous headaches for 5 years and had been sleeping fitfully for the past 2 years. Her temper had been short with her children and she felt badly about it. Her doctor gave her tranquilizers and advised her to take them when she was overwrought. She and Robert had been sleeping in separate beds in the same bedroom until recently and last had intercourse in August of 1974. They no longer entertained, socialized or ate together.

During cross-examination, Rosalyn testified that their eldest daughter had been awarded a scholarship for the first year of college which covered her tuition but not her housing. Their daughter paid for part of her housing from earnings, savings and gifts. Robert paid Rosalyn $50 a week during 1974 pursuant to a court order and had paid the mortgage and real estate taxes on the house that year. During redirect, she stated that she had been seeing a psychiatric social worker since the fall of 1973. Robert told her that she could have the divorce if she would agree to sell the house immediately. She later testified that her daughter was having trouble with her nervous stomach as a result of the divorce proceedings.

Renee Brind testified that she lived across the street from the Graffs, and was a friend of Rosalyn. In 1969, she and her husband spent New

Year's Day with the Graffs, and Robert was flushed and boisterous. Rosalyn seemed embarrassed by his behavior. In 1972, Robert passed out on a couch during a party at her home. Rosalyn also seemed embarrassed by Robert at a banquet during a bowling weekend in 1971, when he was loudly dressed and went from table to table, while everyone else was more reserved. He ignored his wife during the remainder of the weekend. During cross-examination, she stated that she did not know whether he was an officer of the bowling league. The testimony of Sam Paven, Rosalyn's brother, was substantially similar to Rosalyn's regarding Robert's tardiness for various family celebrations.

Robert was first called to testify as an adverse witness under section 60 of the Civil Practice Act. (Ill. Rev. Stat. 1973, ch. 110, par. 60.) He testified that he is a real estate salesman in partnership with his brother. His occupation necessitated late and irregular hours. He was a member of several organizations and an officer of some, which further required him to attend various meetings. Many times he would telephone his wife to inform her that he would be late and often the line would be busy or there would be no answer. The remainder of Robert's testimony essentially consisted of denials of Rosalyn's allegations regarding the open bathroom door, whistle blowing, calling her crazy, using profane language against her and shoplifting.

Robert testified in his own behalf that he was vice president of the bowling league and therefore at the luncheon described by Brind he went from table to table welcoming people. He did not recall being late to a wedding or causing his wife's family to wait dinner for him while he attended to chores. He recalled blowing a whistle at a convention in Canada, while others were whistling with their fingers. He stated that he had asked his wife to observe the Sabbath and to serve proper meals but she objected to serving Kosher food. He stated that he and his wife slept in the same room and they had sexual relations 4 or 5 months before. She moved her bed out of the room 2 weeks before. He also testified that his daughter had been troubled by a nervous stomach for several years.

Earl McTavish, testified that he was a real estate broker and acquainted with Robert. He had dealt with Robert in business and was a member of some of the same business and social committees. McTavish recalled that at a luncheon and a banquet which he and Robert each attended, Robert's behavior was no different than anyone else's. Harry Baron, who had known Robert for 10 years, testified that the latter had handled the sale of his business property and he was satisfied with Robert's services. Rosalyn's attorney stipulated that if two other witnesses were called, they would testify to Robert's good character, his high level of business ability and the necessity of late hours in the real estate business.

**OPINION**

██ In order to determine whether Rosalyn proved, by a preponderance of the evidence, that Robert's acts constituted extreme and repeated mental cruelty, we must find that the alleged acts caused her embarrassment, humiliation and anguish so as to render her life miserable or unendurable or to cause her health to be endangered. (*Collins v. Collins* (1977), 47 Ill. App. 3d 258, 361 N.E.2d 787; *Murphy v. Murphy* (1975), 31 Ill. App. 3d 321, 334 N.E.2d 779; *Gregory v. Gregory* (1974), 24 Ill. App. 3d 436, 321 N.E.2d 122.) Proof of isolated incidents of mere humiliation or embarrassment is not enough. (*Klakk v. Klakk* (1976), 41 Ill. App. 3d 462, 354 N.E.2d 64.) The ultimate test is the effect of the complained of conduct upon the complaining party and the marriage. In determining the effect, the court is entitled to consider the respective emotional makeup of the parties and the circumstances under which the complained of acts occurred. (*Murphy v. Murphy* (1975), 31 Ill. App. 3d 321, 334 N.E.2d 779; *Gregory v. Gregory* (1974), 24 Ill. App. 3d 436, 321 N.E.2d 122.) Further, the conduct must have been unprovoked (*Rosenbaum v. Rosenbaum* (1976), 38 Ill. App. 3d 1, 349 N.E.2d 73) and must have occurred on at least two separate occasions (*Collins v. Collins* (1977), 47 Ill. App. 3d 258, 361 N.E.2d 787).

██ In reviewing the evidence, we find that these requirements were met. Rosalyn produced evidence of a continuing and repeated course of conduct on the part of Robert, unprovoked by her, including verbal threats, vile language, rudeness, irrational behavior and fits of temper which caused her acute embarrassment and anguish in front of her children and their friends, her family, and her own friends. The acts further caused her mental distress which affected her performance at work and caused her health to be impaired. The trial judge specifically stated that he believed Rosalyn and disbelieved Robert, and we see no reason to overturn his finding, since he was in the best position to assess their credibility and to determine the issues of mental cruelty and lack of provocation. (*Smith v. Smith* (1977), 47 Ill. App. 3d 583, 362 N.E.2d 123.) His finding was not against the manifest weight of the evidence.

The next issue presented for our review is whether the trial court erred in ordering the associate judge in the land title division to execute a deed for Robert's one-half interest in the marital home. Robert contends that the jurisdiction of the divorce court ceased once he filed a notice of appeal from that proceeding. We disagree.

Supreme Court Rule 305 (Ill. Rev. Stat. 1975, ch. 110A, par. 305) provides, *inter alia:*

"(a) * * * (1) An appeal stays the enforcement of a judgment for money only if a notice of appeal is filed within 30 days after the entry of the judgment appealed from *and a bond in a reasonable*

*amount to secure the appellee is presented, approved, and filed* within the same 30 days or within any extension of time granted under subparagraph (2) of this paragraph. Notice of the presentment of the bond shall be given to the appellee.

∗ ∗ ∗

(b) ∗ ∗ ∗ (3) The stay, whether granted by the trial or reviewing court, shall be conditioned upon such terms as are just. *A bond may be required in any case, and in the case of a judgment for money, or a stay for the protection of interests in property, shall be required."* (Emphasis added.)

■ Robert failed to comply with the above rule as there is no record of either an appeal bond or even a motion for a stay having been filed by Robert either before this or the trial court. Robert contends he is somehow exempted from the requirements of Rule 305 but the cases he cites are inapposite because they involved situations where the parties attempted to amend their pleadings or the trial court amended its judgment after the notice of appeal had been filed. (*E.g., Brehm v. Piotrowski* (1951), 409 Ill. 87, 98 N.E.2d 725; *Dunwoody & Co. v. Washington* (1942), 315 Ill. App. 54, 42 N.E.2d 113.) They are not similar to the case here where the court was merely endeavoring to enforce its judgment. It is well established that a court may make any orders necessary or appropriate to secure payment of alimony. (*Green v. Green* (1976), 41 Ill. App. 3d 154, 354 N.E.2d 661.) We thus find that the notice of appeal did not automatically stay the trial judge's jurisdiction over the marital home.

Additionally, we find that Robert received proper notice of the execution of the deed. From the very beginning of this case, Robert had been apprised that Rosalyn was seeking complete ownership of the marital house. In her complaint for divorce, she stated that she was joint owner of the house with Robert and that she had special equities in it. In her prayer for relief, she requested that she be awarded the marital home. Robert conceded that Rosalyn was joint owner of the house, but he fully contested the divorce. He testified both as a section 60 witness and as a witness on his own behalf and has not suggested that his participation in the hearing has been impeded in any way. After the hearing on the divorce, the trial court entered a divorce decree and awarded alimony to Rosalyn. The decree awarded the marital home to Rosalyn as alimony in gross and contained a provision that if Robert failed to quitclaim his deed to her within 10 days, an associate judge of the land title division would execute a deed in his stead. (See Ill. Rev. Stat. 1975, ch. 22, par. 46.) Robert refused to sign the deed and filed his notice of appeal.

We believe that this record demonstrates that Robert had received notice of the fact that his interest in the marital home was involved in the

divorce proceeding so that he could have an adequate opportunity to defend his interests in the property at the proceedings. (*In re Estate of Hecht* (1978), 63 Ill. App. 3d 539, 379 N.E.2d 1322.) The record indicates that he took full advantage of his opportunity to defend. Thus, this case does not represent a situation where notice is required because a party was not aware that his or her interests were involved in a lawsuit. *Klaisner v. Klaisner* (1975), 28 Ill. App. 3d 110, 328 N.E.2d 341.

Since we find that notice was proper and that the divorce court's jurisdiction was not stayed by the filing of the notice of appeal, we cannot say that the trial court in the partition proceeding erred in granting Rosalyn's motion for a summary judgment. The property which was the subject matter of the partition proceeding already had been disposed of in the divorce proceeding and, thus, there was no genuine issue as to any material fact in the partition proceeding. Ill. Rev. Stat. 1975, ch. 110, par. 57 (3).

■■ We finally mention that we presume that the finding of alimony in favor of Rosalyn and its allocation was supported by the record, although the portion of the transcript in this case concerning the financial abilities of the parties is missing. (*Pedersen v. Pedersen* (1975), 34 Ill. App. 3d 118, 339 N.E.2d 262.) Thus our decision in no way disturbs this finding of the trial court regarding the form of alimony or the division of the property.

For the foregoing reasons, the judgments of the trial court are affirmed.

Affirmed.

SULLIVAN, P. J., and LORENZ, J., concur.