JEANETTE FILIPELLO, Plaintiff-Appellant, *v.* MICHAEL ANGELO FILIPELLO, Defendant-Appellee.

(No. 53197;

First District—February 18, 1971.

Bellows, Bellows & Magidson, of Chicago, (Jason Bellows, of counsel,) for appellant.

Michael Angelo Filipello, *pro se.*

Mr. JUSTICE DEMPSEY delivered the opinion of the court:

This is an appeal from an order granting a father permanent custody of his minor children.

Jeanette Filipello and Michael Filipello were divorced in 1962. Custody of their two children, Regina, age seven, and Michael, Jr., age four, was awarded to the mother. In October 1965 Filipello, who had remarried in 1964, filed a petition for custody. He alleged that his former wife had been arrested for conspiracy to commit murder and was morally unfit to bring up the children.

Attached to his petition were four newspaper articles which supported his charge. According to these articles, the former Mrs. Filipello had employed a man to kill the wife of her lover. Using a key furnished by Mrs. Filipello, her fellow conspirator entered the woman's home with the intention of strangling her, but lost his nerve and fled. The woman ran from her house and obtained the license number of his departing auto and he was arrested. Both he and Mrs. Filipello confessed and the sordid details were revealed. For two years she and the woman's husband had carried on an illicit relationship and during this period he moved in and out of the home occupied by her and the Filipello children. In an attempt to bring about a divorce, she anonymously communicated details of the love affair to her lover's wife. Despairing of success, she determined to murder the woman and induced a fellow-employee to kill her by promising to give him $1,500.00.

Filipello's petition was granted and the children resided with him until June 1967.

In October 1966 Mrs. Filipello petitioned for re-instatement of the original order of custody. The petition was continued from time to time and in June 1967 she filed an emergency motion for immediate custody. The motion alleged that there had been a change in circumstances since the entry of the order placing the children with their father; that she had remarried and was able to provide the children with a better home; that the children had developed hostility toward their father and his new wife, had been physically abused by them and had run away to the home of an aunt. Filipello's answer denied that changed circumstances justified a change in custody. He stated that if there was any hostility toward him on the part of the children it was engenered by their mother.

A hearing was had and an order entered which, without prejudice to the rights of either party, placed the children with the aunt until the further order of the court. Each parent was given visitation rights and the custody of the children on alternate week-ends. The children, although continuing to go to the same school they had attended while living with their father in Berwyn, resided with their aunt at her home in Oak

Lawn until November 1967, when the order was entered from which this appeal was taken.

By the time the hearing to determine permanent custody was held in November 1967, two investigations of the parents' homes and circumstances had been conducted by the Court Service Division of the Department of Public Aid, and two petitions for custody were before the court: The mother's, filed in October 1966, and the aunt's, filed in September 1967, after leave to intervene had been allowed.

The aunt submitted no evidence; her attorney, however, argued in her behalf. In support of her petition the mother testified herself and presented the testimony of her new husband, the Filipello children, four policemen, a psychiatrist and a neighbor. The mother testified that she had remarried in May 1967 and lived with her husband and his two daughters by a previous marriage in a ten-room home in Arlington Heights. She said she loved her children and would be able to provide them a good home. Her husband stated that she took good care of his ten and four-year-old daughters and that they and the Filipello children played together and did not quarrel.

Regina Filipello, who was twelve years of age at the time she testified, said she would like to live with her mother but if she could not she preferred to stay with her aunt. She told of two incidents that had taken place while she and her brother lived with their father. The first incident concerned herself. She related a conversation with her father about having her ears pierced for earrings. It appears that she had requested that this be done and her father arranged an appointment for her with a doctor but she changed her mind because her mother disapproved. Her father spoke about the mother's power over her and said if her ears were pierced the power would be gone. The second incident concerned her brother. On a day in February 1967, Michael had been instructed by his stepmother to clean his room. He protested that he would be late for school. She insisted that he pick up the room and he did so, but as he left the house he said to her, "I wish you were dead." When he returned from school she punished him by striking him on the buttocks with a belt. She warned him not to tell his father. However, the following weekend, when they were visiting their mother [who was residing in the Forest Park home of the man she later married], he told her about it. The mother telephoned the father who knew nothing about the punishment. After their mother had done this, Regina said she and her brother were afraid to go back to their father's home. The mother called the Forest Park Police Department and an officer came to the house. He was shown Michael's bruises and he took the children to the Forest Park station and then to the Berwyn

police station. From there, at their request, they were taken to the juvenile home where they stayed for three days.

Two police officers, one from Forest Park and the other from Berwyn, testified about the last incident. They saw the bruises on the boy and were told who inflicted them. The first officer testified that the children said their father was cruel, that they did not love him or want to live with him. The second officer said that the father came to the Berwyn station that evening about 9:30 P.M. to complain that the children had not been returned to him. He was there when the children and the mother arrived with the Forest Park policeman. After lengthy discussions with all concerned, the officer gave the children the choice of going home with their father or of being taken to the Audy Juvenile Home. They pleaded for permission to go with their mother. The officer refused and the children asked, amidst tears, to be taken to the Audy home.

Michael, nine years old and in third grade, testified that his father picked him up each morning at his aunt's home in Oak Lawn and drove him to school in Berwyn, and that each afternoon either his father or stepmother came for him after school and returned him to his aunt's home. He told of a dispute between his parents in June 1967 while he was living with his father. The dispute arose over his mother's taking him home from Little League baseball games in which he played; his father also took him home after these games and objected to the mother's doing so. He said his father kicked his mother's car and tried to punch her. He ran away from home, he said, because he thought his father would forbid him to play baseball.

A third policeman supplied further details. In response to the mother's telephone call he went to her home. The boy was there and she asked that he be taken back to his father. The boy told the officer about his mother driving him home from baseball games and that his angry father locked him in his room; he became frightened and rode his bicycle to his mother's house. The officer drove the boy home and the mother rode with them. She remained in the car when he took the boy to the front door. The father told the boy to get into the house. The boy complied, reluctantly. His sister came to the door, saw her mother and waved to her. The father told her to go inside. As she did so she started crying.

A fourth policeman told about another occasion when the mother enlisted police assistance. She and her husband brought the Filipello children to the Forest Park station on a Saturday night in June 1967. She said they were returning the children to their father and asked that a policeman accompany them.

A psychiatrist examined the children a week before they appeared in

court. He stated that the children got along well with their mother but not with their father; that they took her side and did not care to remain with him. From his observation and interrogation he concluded that neither child was emotionally disturbed. An objection was made and sustained to the question when he was asked whether the children's living with the father would cause them to have mental illness.

A woman who had been the former Mrs. Filipello's neighbor from June 1964 to May 1966 testified that she was a neat housekeeper and her children were well-behaved. She was present on two occasions when the father was coming to get the children. They protested to their mother saying they wanted to remain with her. An objection was made and sustained to her testimony.

The father testified that he had adopted the eight-year-old daughter of his present wife and that they had a twenty-month-old girl of their own. He said these children and the Filipello children got along well together. His family lived in a bungalow in Berwyn. He was an automobile repairman with 18 years experience and earned around $13,000.00 a year. He said he enrolled his son in Little League baseball and had enrolled both his son and daughter in another Berwyn athletic organization. Regina wanted to play a musical instrument and he arranged for her to have lessons and attended her recitals. He took his son fishing and on other outings. The children had many friends who visited them, sometimes staying overnight. He stated that he loved his children and had birthday, Halloween and Thanksgiving parties for them. Pictures taken at these parties showing the happy faces of the children were introduced into evidence.

Also introduced into evidence was proof of the former Mrs. Filipello's complicity in the attempted murder. She had been indicted for conspiracy to commit murder, had pleaded guilty to the indictment and had been released on probation for a period of five years.

At the conclusion of the custodial hearing the trial judge placed the children permanently in the father's care. He made the following observations:

"The time has come when the children have got to have a stabilized home. * * *

The father had these children for a number of years * * *. There has been no attack on this man's character. I haven't heard any evidence that would say this father is unfit * * *. He had them as a matter of law. A court saw fit to give this man legal custody.

* * * *

I feel you are dealing here with a woman * * * that is emotionally unstable."

The mother contends that the court erred in not permitting the psychiatrist to testify whether continuing to live with their father would have an effect on the children's mental health, and in excluding the neighbor's testimony. She urges that the children's preference to live with her should have been considered by the court and that the father did not prove a change in circumstances sufficient to cause a modification of the custody provisions of the divorce decree.

■■ The objection to the psychiatrist's testimony was on the ground that his answer would invade the province of the court in deciding the ultimate question of what was best for the children. The objection to the neighbor's testimony was on the ground that her testimony related to the time the children were in their mother's custody—prior to their being taken from her in October 1965. The latter objection was properly sustained, the former was not. The principal issue at the hearing was whether there had been a change in circumstances between the 1965 order and the mother's 1967 petition which warranted transferring custody from the father to her. Events that took place before the 1965 order were irrelevant to this issue. The testimony of the psychiatrist, on the other hand, was relevant. The overriding consideration in all custody cases is the welfare of the children. The psychiatrist was testifying as an expert witness and the expression of his opinion on whether or not living with the father would affect the children mentally, would not usurp the decision-making function of the court. Sustaining the objection to this portion of his testimony was error but not an error of such magnitude that would justify a reversal of the court's decision.

■■ The mother is mistaken in her contention that the father did not prove a change in circumstances sufficient to cause a modification of the decree. First, the burden of establishing a change of circumstances was not his, but hers. Second, the uncontroverted allegations of his petition of October 1965 justified removing the children from her and the order entered pursuant to the petition gave him custody. This order was not appealed and was still in effect at the time of the final hearing. Placing the children in the aunt's care during the summer and fall of 1967 was without prejudice to the 1965 order.

To justify a change in custody, the evidence must establish that the parent to whom the children were last awarded is unfit to retain custody or that a change of circumstances makes a change of custody in the children's best interest. In requesting that the children be returned to her, the mother did not charge that the father was an unfit parent. She relied upon these changed circumstances: she was remarried, lived in a larger house and would give the children a good home; the son repeatedly ran away from the father; he had been punished so severely by the father's

wife that he had black and blue marks; the children dislike their father and preferred living with her.

■■ The mother's remarriage and having a larger house than the father were factors to be considered by the court but were not sufficient reasons for a change of custody. (*Eggemeyer v. Eggemeyer* (1967), 86 Ill.App.2d 224, 229 N.E.2d 144; *Vysoky v. Vysoky* (1967), 85 Ill.App.2d 306, 230 N.E.2d 3.) The young boy's departures from his father's home were prompted by the punishment he received, or upon the fear, real or unfounded, that he would be punished. These runaways and the other incidents testified to by the children, such as the father's remark about the piercing of the girl's earlobes, were of little significance. They did not indicate that their living conditions were so deplorable or their father's discipline so intolerable that they should be removed from his supervision. Punishing the boy for his insolence to his stepmother was proper. The severity of the punishment was not. However, this was the only time the stepmother punished him in this fashion and such an isolated occurrence was not ground for a custodial change.

The mother's main reliance is on the children's lack of affection for their father and their preference to live with her. The daughter testified that she did not like her father. She said that prior to her parents' divorce they quarreled a great deal and, although she did not know who was right or wrong, she became attached to her mother. The psychiatrist testified that she told him she loved her father but this changed after the divorce. The son's attitude toward the father was not so clearly spelled out. The psychiatrist and policemen related what he told them, but he himself testified that he had good times with his father. There is no doubt, however, that he preferred his mother. Adolescent children feel closer to their mother than to their father. This natural disposition is accentuated when the father is the family's chief disciplinarian. In a child's eyes any act of discipline seems harsh, any punishment cruel. The children were reported as saying that their father was cruel, but the complete testimony showed him to be a good father; he spent time with his children and saw to it that they had a full family life. Not one witness testified to any act of neglect and there was no evidence that he was cruel or otherwise unfit.

■■ The children's desire to live with their mother is not controlling. If children are of sufficient maturity, their choice is an important element to be taken into account. (*Oakes v. Oakes* (1964), 45 Ill.App.2d 387, 195 N.E.2d 840.) But even the desire of older children to live with a particular parent is not binding on the court. (*Stickler v. Stickler* (1965), 57 Ill.App.2d 286, 206 N.E.2d 720.) The Filipello children, nine and twelve years of age, were not old enough or capable enough to choose the parent

with whom they should live. Their preference had to yield to their welfare and determining this was the court's responsibility, not theirs.

■■■ Discharging this responsibility—deciding between parents who have equal love for their children—is always difficult, often agonizing. The trial judge has broad discretion in custody cases for he has the benefit of observing both parents and the opportunity of assessing their temperament, character and capabilities. Usually, if both parents are fit, minor children are placed in their mother's care. Conditions and circumstances vary, however, and sometimes this cannot or should not be done. There is no arbitrary rule that requires custody to be awarded the mother even if she is found to be a fit parent; paternal guidance may be more desirable than maternal indulgence and custody will be granted the father whenever the children's best interest so requires. *Carlson v. Carlson* (1967), 80 Ill.App.2d 251, 225 N.E.2d 130; *Corcoran v. Corcoran* (1967), 79 Ill.App. 2d 328, 224 N.E.2d 611.

Both parents had re-married. Whether placed in either household, the children would be living with a stepparent. In both households they would be sharing attention and affection with children of other marriages. They professed to like their mother's husband but not their father's wife. They had stayed with the stepfather only a few weekends; with the stepmother 20 months. This disparity hardly afforded a fair comparison for the trial judge to evaluate. There was nothing before the court to suggest that the children knew of the mother's involvement with the law or that they were able to appreciate the gravity of her misconduct. It appears that they had been shielded prior to the trial, and properly so, from this knowledge. At the trial they were excluded from the courtroom except when they testified. Thus, there was no way for the court to estimate what influence her criminal offense might have on their feelings for her or their father.

■■ The court made no finding that the mother was unfit to bring up the children. A specific findings of unfitness was unnecessary. (*Osborn v. Hufsey* (1963), 44 Ill.App.2d 157, 194 N.E.2d 556.) Compelling evidence had been introduced as to her unfitness. She had exposed the children to her immoral behavior by living with one married man in the home occupied by herself and children and by residing with another married man in a home visited by the children. She had pleaded guilty to a crime involving moral turpitude, was on probation for that crime at the time of the court's decision and the probationary period had three years and seven months to run. The court's decision that the children should remain with the father can be sustained either on the basis of her unfitness or on the basis of her failure to prove a change in circumstances.

■■ It is suggested that the mother has been pardoned for her crime

and that we should take this into consideration. This cannot be done. We must decide whether the trial court's decision was right or wrong. Our judgment must be made on the record that was before the court— not on developments that may have occurred subsequent to that court's decision.

The judgment is affirmed.

Judgment affirmed.

McNAMARA, P. J., and SCHWARTZ, J., concur.