SHARON LEE DE FRANCO, Petitioner-Appellant, v. RONALD D. DE FRANCO, Respondent-Appellee.

First District (1st Division)    No. 78-1331

Opinion filed December 26, 1978.—Modified on denial of rehearing February 6, 1979.

Fumel and Haberman, and Synek, Bishart & Porikos, both of Chicago (Morton J. Haberman and Henry T. Synek, of counsel), for appellant.

Kaufman & Litwin, of Chicago (Stuart Litwin and J. Scott Bonner, of counsel), for appellee.

[1]Mr. JUSTICE BUCKLEY delivered the opinion of the court:

This is an appeal from an order of the circuit court of Cook County which modified a decree of divorce by transferring custody of minor children from the mother, petitioner-appellant Sharon De Franco, to their father, respondent-appellee Ronald De Franco.

Sharon and Ronald De Franco were married on March 30, 1968. Their marriage was dissolved on March 23, 1977, when petitioner obtained a divorce from respondent on the grounds of extreme and repeated mental cruelty. Pursuant to the divorce decree and property settlement agreement, petitioner, having been found to be a fit and proper person, was granted the care, custody, control and education of Alissa Mae De Franco and Annette De Franco, the minor children of the parties. Respondent was granted rights of "liberal visitation."

On November 21, 1977, respondent filed a "Petition to Modify Judgment for Divorce" alleging that Sharon De Franco had commenced cohabiting with a male person in the residence occupied by her and the minor children. The petition further alleged that it was not in the best interest of the parties' minor children to remain in this unhealthy environment and prayed respondent be awarded their sole care and custody.

On November 29, 1977, petitioner filed a motion to strike respondent's petition for failure to comply with section 610 of the Marriage and Dissolution of Marriage Act (Ill. Rev. Stat. 1977, ch. 40, par. 610).

On March 27, 1978, the circuit court entered an order allowing respondent to modify and amend his petition and to file a supporting affidavit in compliance with section 610. This order was complied with on March 28, 1978, when respondent filed his "Verified Amended Petition to Modify Judgment for Divorce." This amended petition essentially repeated the allegations of the first petition and further alleged that the

---

[1] This opinion was prepared by Justice Buckley while assigned to the Illinois Appellate Court, First District.

environment caused by petitioner's cohabitation with Joseph Bond will endanger seriously the minor children's mental, moral and emotional health. On April 4, 1978, petitioner filed her answer to respondent's verified petition and on April 24, 1978, this cause was heard by the circuit court. After hearing the testimony presented, the court made the following finding:

> "[T]he Court finds that the unequivocal evidence shows that the custodial parent, Sharon, has been living in the conjugal relationship in the presence of the children with one Joseph Bond. The Custodial Parent, Sharon, has called a witness who has testified that the older child, * * * Alissa was high-strung and upset and this occurred during the middle of the week."

In ordering that custody of the minor children be transferred from the mother to the father, the court further stated that:

> "[I]t would appear that there has been evidence adduced that this course of conduct * * * could be or is a factor or a contributing factor to Alissa's high-strung and upset condition."

The record establishes the following pertinent facts. In June of 1977, Joseph Bond moved into the residence of Sharon De Franco and her two minor children, Alissa, age five, and Annette, age two. Bond was married, but separated from his wife and was attempting to secure a divorce. Petitioner testified that she and Bond planned to marry when he became divorced.

From June 1977 until the end of October 1977, petitioner and Bond openly cohabited in the presence of the minor children. Petitioner testified that Bond moved his clothing and personal effects into her home; that he slept in her bedroom sharing her double bed and that they engaged in sexual intercourse and other sexual activities during that time. She further testified that for the most part Bond did not contribute to the support of herself and the minor children. She was not gainfully employed and was expanding child-support funds for food and accessories for her "enlarged family."

What aspects of petitioner's conjugal relationship with Bond were witnessed by the children and the effects of this relationship on them are matters of dispute. Nonetheless, the following facts are uncontroverted: Petitioner and Bond slept in a double bed with the door unlocked. Moreover, the door to the master bedroom had been removed during remodeling for a seven- to 10-day period. Petitioner testified that Alissa knew her mother and Bond were not married but were sleeping together. She further testified that Alissa would wake from a nightmare and come into the master bedroom for comforting a few times per week.

Petitioner neither discussed nor explained her living arrangement with her children because they never asked. She merely told Alissa that

Bond "will be staying with us for a while." The children referred to Bond as "Uncle Joe."

According to petitioner, Bond moved out at the end of October 1977. Nonetheless, Bond continued to visit petitioner at least twice a week at her Northlake residence. On those occasions the two had sexual relations on the couch while the children were upstairs. Petitioner testified that these sexual relations continued until about February 1, 1978, when she and her children moved to Wheeling, Illinois. She continued to see Bond at her Wheeling residence about once a week but denied that sexual contacts continued.

At the hearing petitioner remarked that although she originally thought it right to allow Bond to move in, she would never do it again. Nonetheless, she admitted that under some circumstances she would approve of her daughter living with a man without the benefit of marriage.

Lee Koziol, a neighbor of petitioner and respondent in Palatine, testified on behalf of petitioner. She said that she had visited petitioner and her children once or twice a week at their Northlake residence and had observed the children's home life. In her opinion Alissa often appeared highstrung and at times upset. These disturbances were manifested during the middle of the week.

Respondent first learned that his ex-wife was cohabiting with Bond from Alissa. He testified that he had attempted to dissuade petitioner from continuing this living arrangement but she refused to discuss the matter. Respondent objected to petitioner's behavior from a moral standpoint and believed his daughters were being subjected to an unhealthy environment.

Respondent was also permitted to testify as to some of Alissa's statements to him for purposes of establishing her state of mind. (See *Quick v. Michigan Millers Mutual Insurance Co.* (1969), 112 Ill. App. 2d 314, 250 N.E.2d 819 (exception to rule precluding hearsay testimony: a statement of declarant's then existing state of mind, emotion, sensation, or mental condition.) Alissa told her father that she had slept with her mother and Bond and that she "had seen Joe and mama kissing in the bed and Joe calling, mama, mama."

The record also establishes that respondent was a contractor in the heating and air conditioning business. On April 10, 1978, he married his secretary, Deborah. Ronald De Franco moved in with Deborah, her 10-year-old daughter, and her parents in Northbrook, Illinois. At the time of the hearing, respondent was in the process of building a four-bedroom home in Kildeer, Lake County, Illinois. Deborah testified that she would remain at home during the day to care for the children in the event their custody was granted to respondent.

Petitioner contends on appeal that the circuit court erred: (1) in transferring custody of the minor daughters to respondent because her sexual impropriety was not proved to negatively affect the children; (2) in not considering factors bearing upon child custody mandated by section 602 of the Marriage and Dissolution of Marriage Act (Ill. Rev. Stat. 1977, ch. 40, par. 602); (3) in failing to delineate written findings of fact as to the basis for its order; (4) and abused its discretion in neither interviewing the children, nor appointing a guardian ad litem on their behalf, nor ordering an investigation and report by the Department of Children and Family Services (D.C.F.S.); and (5) in denying petitioner's post-trial motion.

We find the circuit court's rulings proper in all respects and address petitioner's contentions sequentially as above.

■■ In custody modification cases courts are cognizant of competing social concerns: the social interest favoring the finality of judgments and the *parens patriae* duty of the State to protect the welfare of children. Avoidance of unnecessary disturbance of children requires that the noncustodial parent bear the burden of proving the best interest of the children necessitates a custody change. *King v. Vancil* (1975), 34 Ill. App. 3d 831, 341 N.E.2d 65; *Jacobs v. Jacobs* (1974), 25 Ill. App. 3d 175, 323 N.E.2d 21.

Case law and section 610 of the Marriage and Dissolution of Marriage Act (Ill. Rev. Stat. 1977, ch. 40, par. 610) require that a divorce judgment be modified only if there has been a material change of circumstances since its entry. (*Taylor v. Taylor* (1961), 32 Ill. App. 2d 45, 176 N.E.2d 640.) Furthermore, that material change must impact upon the welfare and best interests of the children or the custodial parent must be proved unfit (*Vanderlaan v. Vanderlaan* (1972), 9 Ill. App. 3d 260, 292 N.E.2d 145). Section 610 of the new Act additionally provides:

> "[T]he court shall retain the custodian appointed pursuant to the prior judgment unless:
>
>          *   *   *
>
> (3) the child's present environment endangers seriously his physical, mental, moral or emotional health and the harm likely to be caused by a change of environment is outweighed by its advantages to him."

■■ However, the instant cause may be controlled by a line of cases which indicate that a change of circumstances is not necessary where there was not a full hearing by the court at the time of the original placement of the child but custody was achieved by the stipulation of the parties. In this situation the court may use initial discretion in deciding what custody provisions provide for the children's best interests. (*Schultz v. Schultz* (1976), 38 Ill. App. 3d 678, 347 N.E.2d 749; *McDonald v. McDonald*

(1973), 13 Ill. App. 3d 87, 299 N.E.2d 787.) We note that the judgment for divorce indicates that the trial court heard the case as a default matter upon the stipulation of the parties, gathered certain evidence, and found petitioner to be "a fit and proper person to have the care, custody, control and education of the minor children * * *." It is not clear from the record whether the trial court conducted a full hearing concerning custody factors or merely implemented the stipulation of the parties. We need not resolve this dilemma as we find that the trial court's determination was not erroneous under the more stringent "changed circumstances" standard.

The trial court has broad discretion in custody cases both because the determination of the welfare of children involves questions of fact and because the trial judge is in the best position to hear the evidence, make pertinent inquiry, and evaluate the credibility and candor of witnesses. (*Wells v. Wells* (1976), 36 Ill. App. 3d 488, 344 N.E.2d 37.) An order of the trial court will not be disturbed upon appeal unless it is against the manifest weight of the evidence or a manifest injustice will result. *Murphy v. Murphy* (1975), 31 Ill. App. 3d 321, 334 N.E.2d 779.

Petitioner argues that the mother's sexual improprieties are irrelevant unless proved to have a negative effect on the children (Ill. Rev. Stat. 1977, ch. 40, par. 602(b)) (conduct must affect parent's relationship with child) and relies upon the recent case of *Jarrett v. Jarrett* (1978), 64 Ill. App. 3d 932, 382 N.E.2d 12, delivered by the First District. (See also *Nye v. Nye* (1952), 411 Ill. 408, 105 N.E.2d 300; *Arden v. Arden* (1960), 25 Ill. App. 2d 181, 166 N.E.2d 111.) *Jarrett* similarly involved an appeal by the mother from a trial court order granting change of custody of three minor children to the father. This order was entered because the mother's boyfriend had moved into the residence shared by mother and children. The trial court found it "necessary for the moral and spiritual well-being and development of the children that they reside with their father." The appellate court reversed this order holding that the mother's relationship was not relevant since the evidence did not indicate any negative effect upon the minor children.

*Jarrett* is distinguishable, however, as it involved a relationship that constituted fornication whereas the present case involves adultery. Both adultery and fornication are criminal conduct if open and notorious. (Ill. Rev. Stat. 1977, ch. 38, pars. 11—7, 11—8.) However, adultery is viewed as the more opprobrious offense since it is a Class A misdemeanor while fornication is Class B. The Committee Comments to the Criminal Code explain this distinction:

> "The Committee felt it was appropriate to make a distinction between adultery and fornication. *Adultery involves an affront to a*

*specific marriage relationship, in addition to an affront to the institution of marriage in general. It was felt that this more seriously offends the public peace."*

"[I]t is the scandalousness, the affront to public decency and the marital institution that is of pivotal concern in this crime * * *."

Ill. Ann. Stat., ch. 38, par. 11—7, Council Commentary, at 425 (Smith-Hurd 1977).

■■ Adultery constitutes an interference with Illinois public policy protecting the marital relationship and the family as an institution. The Marriage and Dissolution of Marriage Act (Ill. Rev. Stat. 1977, ch. 40, par. 101 *et seq.*) and case law evidence this public policy. Section 102 codifies the legislature's desire to "strengthen and preserve the integrity of marriage." Section 401 maintains the requirement of fault grounds for divorce. Additionally, the Illinois Supreme Court and legislature have consistently refused to recognize common law marriages. *Wilson v. Cook* (1912), 256 Ill. 460, 466, 100 N.E. 222, 223-24; Ill. Rev. Stat. 1977, ch. 40, par. 214.

Petitioner argues that this court should place minimal importance upon the adulterous aspects of her relationship with Bond because they planned to marry when he obtained a divorce. It is inconceivable that this court could sanction adultery because one partner might soon be divorced. Such a result would serve to severely undermine any attempt at reconciliation between Bond and his wife in contravention of section 404 of the Marriage and Dissolution of Marriage Act (Ill. Rev. Stat. 1977, ch. 40, par. 404) (conciliation) and longstanding public policy. (See *Ross v. Ross* (1903), 109 Ill. App. 157.) Furthermore, the Committee Comments to the Criminal Code ably point out that "[s]ubsequent marriage by the offending parties does not undo that abuse." Ill. Ann. Stat., ch. 38, par. 11—7, Council Commentary, at 426 (Smith-Hurd 1977).

The abhorrence of adultery is more than a public policy of the State of Illinois. It is a concern central to most civilized cultures. This court would be hard pressed to expressly countenance or provide tacit toleration of this illegal conduct by holding it has no effect on the minor children or their relationship with their mother.

The tie between an adulterous relationship and its effect upon minor children does not lend itself to precise, empirical proof. Such an overly technical construction of the language "conduct * * * that does not affect his relationship to the child," as asserted by petitioner, would be inconsistent with the statutory mandate that custody be modified where "the child's present environment endangers seriously his * * * mental, moral or emotional health." Ill. Rev. Stat. 1977, ch. 40, par. 610(b)(3).

■■ The type of proof required by *Jarrett* denotes psychological or behavioral problems linked to a child's "emotional or mental" health. Granted, the best interest and welfare of a child necessitate that full advantage should be taken of psychiatric evaluations and opinions in custody cases particularly where emotional problems are apparent. (*Carlson v. Carlson* (1967), 80 Ill. App. 2d 251, 225 N.E.2d 130; see also DuCanto, *Mental Illness and Child Custody on Matrimonial Matters,* 7 J. Fam. L. 636-43 (1967).) Nonetheless, the instant case, concerns not just the "emotional health" of the De Franco children but also their "moral health." This distinction must be drawn in order that "moral health" under section 610 of the Act attain meaning. See *Stark v. Stark* (1973), 13 Ill. App. 3d 35, 299 N.E.2d 605.

We believe that the teachings of *Gehn v. Gehn* (1977), 51 Ill. App. 3d 946, 367 N.E.2d 508, provide proper understanding of the court's obligation to protect the moral health of children. In *Gehn* the trial court transferred custody of five minor children to the father because the mother had been involved in an adulterous affair with a man who was separated from his wife.

In affirming the trial court's order the First District observed that:

"The record in this case supports a finding that the plaintiff had no qualms in exposing and exhibiting to her children her illicit relationship with her boyfriend. The plaintiff admits her immoral conduct, but argues that no testimony was presented which would show that her conduct had any ill effect upon the children. It might be not only difficult but impossible to present evidence showing objective effects that such conduct would have on minor children. The effects may well be subjective ones that will raise their ugly heads and make their presence known at some future time. Certainly the conduct of the plaintiff cannot be regarded as good and wholesome moral training." (51 Ill. App. 3d 946, 949; 367 N.E.2d 508, 511.)

See also *Anagnostopoulos v. Anagnostopoulos* (1974), 22 Ill. App. 3d 479, 317 N.E.2d 681 (trial court determination that best interests of the child required a more traditional background for child rather than plaintiff's more experimental views did not constitute an abuse of discretion).

Accordingly, we are of the opinion that the type of flagrant adulterous relationship present here did affect the relationship of mother and children within the meaning of section 602(b) of the Marriage and Dissolution of Marriage Act (Ill. Rev. Stat. 1977, ch. 40, par. 602(b)) and negatively affected the moral health of the De Franco children. *Kline v. Kline* (1965), 57 Ill. App. 2d 244, 205 N.E.2d 775, supports this construction:

"Their adulterous relationship was no simple indiscretion, and no mere imprudent anticipation of a marital right. It was assumed on a permanent basis at a time when they were not legally free to marry each other, * * * The six Kline children, * * * lived with defendant and Croxen during this period, *were exposed to their disrespect of the law and disdain of the standards of morality accepted in the community, and appear to have been aware of some improprieties.*" (Emphasis added.) 57 Ill. App. 2d 244, 251, 205 N.E.2d 775, 779.

There is significant evidence that the De Franco children were aware of their mother's improprieties. Two months after they had been exposed to the trauma of their parents' divorce, they had to accept Bond into their home. They were aware that Bond, who was not married to their mother, was sleeping with her. Moreover, there is evidence that Alissa saw them in bed together on a number of occasions, that the bedroom door was always open, and the door had been off the hinges for seven to 10 days. Even when Bond moved out they continued to have sexual relations on the couch in the den where they could have been witnessed by the children.

■■ Notwithstanding our belief that there is no legislative mandate requiring that a negative effect on the children be demonstrated with empirical precision, the record evidences an emotional, traumatic effect upon Alissa. Lee Koziol testified that Alissa appeared highstrung and upset during the middle of the week. Respondent testified about Alissa's statements to him to establish her state of mind. According to respondent, Alissa said she had slept with her mother and Bond, had seen them kissing in bed and heard Bond calling "mama, mama." When these facts are coupled with evidence that the children were aware of their mother's improprieties, we cannot say that the trial court erred by inferring that a negative effect on the children's emotional health had also been demonstrated. Accordingly, since there was a sound evidentiary basis for concluding that the children's moral and emotional health had been negatively affected, we cannot say the circuit court abused its discretion.

Other factors indicated by the record also influence our decision. Despite making it perfectly clear to her children that she was living with a man who was neither their father nor her husband, petitioner offered no explanations to her children. Charged with guaranteeing the best interest of the children in a custody dispute, it is proper that we look at the situation from their perspective. No doubt their youthful conceptions of the integrity of marriage and the strength of family relationships were disillusioned by the divorce of their parents. To make matters worse, a mere two months after this trauma, Bond moved in. Petitioner suggests

he was the "father figure" the children needed. Yet, from their point of view, he represented new confusion regarding the meaning of domestic solidarity and family life.

Petitioner never attempted to explain her living arrangement with Bond because the children never asked. She only told them that Bond would be staying for a while. To the children Bond was simply "Uncle Joe." It is incongruous to assert that petitioner's misconduct had no effect on her children. Children learn from their parents both expressly and by example. In our opinion, children at an impressionable age should not be exposed to the ideology that there is nothing wrong with mother sleeping with "Uncle Joe."

Petitioner also contends that this court should take into consideration her remorse over a "bad decision" and the fact that Bond is no longer living with her. We concur with the position taken by the court in *Hahn v. Hahn* (1966), 69 Ill. App. 2d 302, 216 N.E.2d 229. There, the trial court transferred custody of the minor children from the mother to the father because the mother had been involved in an adulterous relationship. The court modified custody despite the fact that at about the time the petition for change of custody was filed, the married man moved to Wisconsin. The appellate court affirmed stating:

> "[C]ertainly Dale's [the wife's] conduct cannot be considered conducive to the proper moral training that children of tender years need. We agree with the trial court that the record here is void of evidence that would give any assurance that Dale intended to abandon her ways." 69 Ill. App. 2d 302, 305, 216 N.E.2d 229, 230.

Petitioner alleges remorse, yet we are far from convinced as to her future conduct. Her relationship with Bond correspondingly decreased in intensity with increased legal activity by respondent. Bond moved out near the time the petition for change of custody was filed, yet the adulterous relationship continued and did not cease until near the hearing date. Furthermore, petitioner's testimony that she would approve of her daughter's living with a man without the benefit of marriage under some circumstances curtails the probative value of her alleged remorse.

Another factor bearing upon our disposition is the father's testimony that he harbored moral objections to petitioner's conduct and felt his children were subjected to an unhealthy environment. Furthermore, when he attempted to deal directly with petitioner concerning this problem, she refused to discuss the matter. When a father loses custody of his children due to a divorce, he does not also lose all parental obligations. Ronald De Franco still maintained the right and indeed the duty to attempt to instill his moral beliefs in his children as a concomitant aspect of his parental obligations. See *Abbott v. Abbott* (1976), 40 Ill. App. 3d 348, 352 N.E.2d 404.

Finally, we consider the stability of the children's environment in judging their best interests. (*Mason v. Mason* (1977), 49 Ill. App. 3d 775, 364 N.E.2d 705; *Holloway v. Holloway* (1973), 10 Ill. App. 3d 662, 294 N.E.2d 759.) During the 11-month period subsequent to her divorce, petitioner lived at three different residences causing the children to readjust to new environments.

■■ General environmental factors such as remarriage, employment, and living faciltities, while not controlling, are sufficiently related to children's welfare, even when involving the noncustodial parent. (*Randolph v. Dean* (1975), 27 Ill. App. 3d 913, 327 N.E.2d 473.) The record reflects that respondent offers a suitable environment for the children. Ronald and Deborah De Franco are married, have a new home with ample room under construction in Northlake, and Deborah will be home to supervise the children. Most importantly, change offers the children a healthier moral environment.

■■ While the foregoing factors and circumstances are not individually controlling, considered together and in light of the great discretion accorded the trial court in custody matters, we are convinced that the trial court's decision was neither contrary to the manifest weight of the evidence nor manifestly unjust.

■■ ■ Petitioner's remaining contentions must also be discounted. Petitioner argues that the court erred in not considering all factors enumerated in section 602 of the Marriage and Dissolution of Marriage Act (Ill. Rev. Stat. 1977, ch. 40, par. 602). A review of the record convinces us that there was sufficient evidence of all of its provisions except section 602(a)(2), "the wishes of the child as to his custodian." Despite the seemingly mandatory language of section 602 we do not believe the new Act changes existing Illinois law as to the custody preference of a child of tender years and whether he should be subjected to an in-chambers interview. In our opinion section 602 presupposes that the child being interviewed has sufficient maturity to intelligently express a preference that will aid the court's determination. (See, *e.g., Thomas v. Thomas* (1978), 56 Ill. App. 3d 806, 372 N.E.2d 679; *Rathke v. Peebles* (1975), 31 Ill. App. 3d 711, 334 N.E.2d 362; *Filipello v. Filipello* (1971), 130 Ill. App. 2d 1089, 268 N.E.2d 478.) Since Alissa and Annette were only five and two years old, we cannot say the trial court abused its discretion by not subjecting them to an interview concerning their custodial preference.

■■ We also find that the trial court did not abuse its discretion in failing to appoint a guardian ad litem, or in ordering an investigation and report by the Department of Children and Family Services. (Ill. Rev. Stat. 1977, ch. 40, pars. 506, 605.) Petitioner neither requested nor suggested these procedures prior to or at the time of trial. Implementation of these

procedures on its own motion was subject to the sound discretion of the trial court. The fact that the trial court did not *sua sponte* undertake these procedures is not an abuse of discretion. *Rathke v. Peeples* (1975), 31 Ill. App. 3d 711, 334 N.E.2d 362.

Petitioner also contends that the court erred in failing to delineate written findings of fact. *Drury v. Drury* (1978), 65 Ill. App. 3d 290, 382 N.E.2d 608, and *Doyle v. Doyle* (1978), 62 Ill. App. 3d 786, 379 N.E.2d 713, are dispositive of this issue. The *Drury* court found that although specific findings of fact would aid a court of review, they are not statutorily required.

Petitioner's final contention is that the trial court erred in denying her post-trial motion to vacate the change of custody order or to grant a new trial (Ill. Rev. Stat. 1977, ch. 110, par. 68.3). The only basis of that motion that need be addressed concerned a petition filed by Deborah De Franco on May 15, 1978, clarifying her trial testimony. All other arguments in the post-trial motion are essentially the same as those addressed above. At trial, upon cross-examination, Deborah De Franco testified that while residing in Mount Prospect, Illinois, she had not lived with a "male person." Deborah had interpreted that question to mean residence with a man on a continuing, daily basis. In her petition she stated that she had a relationship with a man who occasionally stayed overnight but that he did not "live" with her.

■■ Petitioner contends Deborah's petition demonstrated that she had deprived the trial court of material information bearing on the children's best interests by her false statement. At the hearing Deborah De Franco testified as follows:

"Did you live with anybody else at that address?
A. No, my daughter always.
Q. And at no time was a male person living there?
A. No."

Counsel for petitioner did not explore this line of questioning further. We concur with the trial court finding that Deborah's petition demonstrated her frankness and merely served to clarify her interpretation of this questioning and her response at trial. Since it is apparent that Deborah's response at trial was a truthful answer to the usual interpretation of the term "live with," we find the trial court correctly denied the post-trial motion.

For the aforementioned reasons we find no abuse of discretion or error by the trial court and its order is accordingly affirmed.

Affirmed.

McGLOON and O'CONNOR, JJ., concur.