In re CUSTODY OF MICHAEL HASKINS BLONSKY.—(KATHERINE HASKINS BLONSKY, Plaintiff-Appellant, v. HOWARD MICHAEL BLONSKY, Defendant-Appellee.)

First District (4th Division)   No 79-1746

Opinion filed May 8, 1980.

Thomas D. Nash, Jr., and Thomas J. Cisar, both of Chicago, for appellant.

Frank R. Krok and Carson P. Veach, both of McBridge, Baker, Wienke & Schlosser, of Chicago, for appellee.

Mr. JUSTICE ROMITI delivered the opinion of the court:

This case concerns the custody of a minor child, Michael Haskins Blonsky, age 5. His parents, Katherine Haskins Blonsky and Howard Michael Blonsky, were divorced pursuant to a final judgment of dissolution of marriage entered May 10, 1977, in California. That judgment incorporated provisions from an interlocutory judgment of dissolution of marriage entered January 31, 1977, which granted custody to each parent for six months of the year. On May 4, 1979, plaintiff commenced this action by filing a complaint for enrollment of the California divorce judgment so as to permit modification of its custody provisions. She subsequently filed a petition to modify the custody provision of the California judgment so as to grant her custody of Michael, alleging that Michael was beginning school in September 1979, this represented a change in circumstances authorizing the court to modify custody, and it would be in Michael's best interest to grant her sole custody. In his answer defendant agreed that the onset of Michael's first school year necessitated a change in the custody provision, but he

further alleged that plaintiff was unfit to assume full custody, he was fit, and accordingly sought a modification granting him custody of Michael for each school year, with custody during summer vacations going to plaintiff. Following a full hearing on the issue the trial court entered an order modifying the prior custody disposition so as to grant physical custody for the period of Michael's school term to defendant, with custody for most of the summer going to plaintiff.

On appeal plaintiff and Michael, by the attorney appointed to represent him during the proceedings, seek reversal and remand for a new hearing based on the following contentions: (1) the trial court in its order failed to make findings required by law before a prior custody judgment is modified; (2) the decision was contrary to the manifest weight of the evidence; (3) the decision was based on improper, prejudicial evidence relating to matters occurring prior to the entry of the California judgment sought to be modified; (4) the trial court in its decision failed to utilize factors statutorily established as relating to the best interest of the child; (5) the trial court improperly considered factors not affecting the relationship of the child to the proposed custodian.

We affirm the judgment of the trial court.

The trial court heard the testimony of plaintiff, defendant, plaintiff's mother, and two psychiatrists. We summarize the relevant evidence.

At the time of trial plaintiff testified that she was supported by her mother and two adult brothers with whom she lived in a five-bedroom home in Chicago. Her mother and brothers were employed full-time and she maintained the household, preparing most meals, doing the laundry and shopping, and caring for Michael in the periods he stayed with her. Michael was well adjusted to this environment and got along well with the neighborhood children. Plaintiff believed she would be the better custodian for Michael because she could care for him full-time, whereas defendant, who was employed all school year, would have to utilize the services of a babysitter or day-care center. Although in her petition she had requested sole custody, at trial she requested substantially the same division sought by the defendant except that she would have the school period.

Plaintiff testified that she was in good health, was not under a doctor's care, and suffered from no illness which would impair her ability to care for Michael. In 1968, following the suicide of her brother, she was treated for depression by a psychiatrist. By 1969 she had fully recovered. In 1976 plaintiff again experienced emotional difficulties. She had undergone two unsuccessful operations for severe injuries sustained in childbirth. Her father was critically ill, she had lost her job, and her marriage was, by her description, a "disaster." In February she left her home, taking Michael without telling her husband or packing any clothing. She travelled to

Chicago where she told members of her family she thought the world would end by Easter and she would be the first to die. She was voluntarily hospitalized for these emotional problems from March 26, 1976, until April 30, 1976, and was under a psychiatrist's care for that period. In March of that year she wrote to her husband and told him she had baptized Michael as a Catholic in January at a time when she thought she was going to die. Later that year she again wrote defendant asking him to raise Michael to be a Catholic if anything happened to her. Prior to their marriage they had agreed they would expose their children to all major religions. At trial plaintiff stated that she personally had baptised Michael in his bedroom.

Plaintiff returned home with Michael in May 1976 but left within 24 hours for Chicago, leaving Michael with defendant. In Chicago her parents urged her to again see a psychiatrist but she refused. She returned to San Francisco with an individual she met in Chicago, staying with that person in San Francisco for about a month. During that period she attempted suicide. Defendant came to where she was then staying and accompanied her to a psychiatrist. In September 1976 plaintiff returned to her family home in Chicago and lived there until the time of the hearing. Defendant had indicated his belief that the marriage was over and she thought she could help her family as her father was in intensive care in the hospital. About a month later, after her father's condition had stabilized, she returned to San Francisco and brought back Michael to Chicago. In December 1977, plaintiff again saw a psychiatrist because of depression. The record of that session indicates that she had experienced hallucinations.

According to plaintiff, during the summer of 1979 Michael had shown some anxiety about his father not reassuring him of future visits to California. However, plaintiff admitted that she failed to read him one portion of a letter from his father in which he wrote of the San Francisco school in which he planned to enroll Michael that fall. Her intention was to place Michael in a private kindergarten that fall and then to enroll him in a Catholic grammar school the next year. She chose that school because of its reputation for excellence, its location two blocks from her home, and the attendance there of many of the neighborhood children. She had met the school's principal briefly but had not viewed any of the classes, nor had she visited the public school which was seven blocks away. The mothers she knew who had children at the public school were satisfied with it. When she had discussed with defendant her intention to place Michael in a Catholic school he threatened not to return Michael to her unless she promised in writing not to do so. She denied having any negative agreement with defendant not to raise their children in one particular religion. However she also stated she did not intend to raise

Michael as a Catholic, did not consider herself a practicing Catholic and had not taken Michael to church. Her intention was to expose him to all religions; she did not intend to insist that he be raised in one religion as opposed to another.

Plaintiff's mother testified generally that plaintiff took excellent care of Michael, who seemed well-adjusted, happy and healthy. It was her opinion that plaintiff was extremely well-qualified to care for Michael. She and her sons contributed financially to the household and, with this money as well as the support payments of the defendant, they were able to adequately care for Michael.

Dr. Bernard Shulman, chairman of psychiatry at St. Joseph's Hospital in Chicago, testified for plaintiff whom he had examined the day before trial commenced. On the basis of this examination as well as a history of her prior psychiatric disorder, including hospital records of her psychiatric treatment, he concluded that she was suffering no psychiatric disorder at the time he examined her. However, her history indicated she had had breakdowns in 1967 and 1976. Her 1976 condition apparently was reactive schizophrenia, a condition brought on by extreme stress. Recovery occurs when the stress is ended. In the absence of such severe stress in the future he was confident she would not break down. Dr. Shulman found no reason why plaintiff should not have custody of her son.

Defendant presented the testimony of Dr. Henry Stipes, a psychiatrist employed by the Psychiatric Institute of the Cook County Circuit Court. He too had examined plaintiff and had reviewed her medical records. He concluded that in 1976 she had suffered a severe reactive psychotic episode due to stress. He defined this condition as a period of time when a person loses contact with reality due to severe stress in their life. In plaintiff's case this stress included recent loss of a job, a severely ill father, marital problems, and a surgical condition which she had difficulty getting treated properly. Her reaction to this stress was rare; only about one percent of the population would develop a psychosis from such stress.

At the time of trial Dr. Stipes believed that plaintiff was not suffering from any mental illness and he found nothing to preclude her from receiving custody of a five-year-old child. However, he also believed that recurrence of stress as severe as she had previously experienced would quite likely cause another psychosis. He found her to behave in somewhat rigid and compulsive ways and also found her to have a limited capacity to deal with stress. Without the emotional support or availability of her family or of similar people he believed it would be very difficult for her to cope with the routine stress of life.

Defendant also testified at trial. He had obtained a master's degree in social work at the University of Iowa and was employed in San Francisco as a school social worker, making approximately $21,000 a year. He also served as coordinating counsel of the San Francisco Delinquency Prevention Commission and was on the steering committee of the San Francisco Celebration of the Year of the Child Task Force. He lived in a two-bedroom home in a middle-class neighborhood of San Francisco near the Pacific Ocean.

Defendant prepared all of Michael's meals during his custodial periods. During these periods he had toilet trained Michael and had weaned him from the use of a bottle. Michael had many friends in the neighborhood. The school in which defendant intended to enroll Michael, located one block from their home, would be over at 12:30 each day. Accordingly, defendant had developed three options for afternoon care: a licensed day-care home, a babysitter, or a nonsectarian recreation center run by a Jewish organization. If plaintiff objected to the latter option defendant would pick one of the others. Defendant believed that plaintiff's emotional condition was still "borderline" and she was not fit to assume full custody of Michael.

Defendant testified that he had been seeing a divorced woman with children of her own for three years. About two times a month she would stay overnight with defendant. He had had sexual relations with her. Michael had a good relationship with this woman and with her children. Defendant had explained to him that he and the woman had a very close relationship, helped each other, enjoyed being together, and that adults did on occasion sleep together in the same bed. Defendant believed there to be nothing improper, obscene or unethical about this relationship. At the time of trial he was still seeing her.

Defendant was displeased when plaintiff revealed she had baptised Michael and he was opposed to Michael being enrolled in a Catholic school. He first learned of plaintiff's plans to do this at trial. Plaintiff had previously told him that she would place Michael in a public school. They had agreed during their marriage that Michael would be taught moral and ethical principles transcending all religions; he would not be raised in one religion. Defendant stated that he did not practice any religion but did believe in God.

Defendant had initiated the divorce proceedings in California, and he had determined and drafted the custody provision. Plaintiff was served with process but did not appear at the proceedings. That hearing only lasted five to 10 minutes. He did not tell the judge at that time that plaintiff was unfit to have custody, but in the context of establishing irreconcilable differences he did tell the judge that her behavior had

been very bizarre and erratic over the previous year. He believed at the time that there was a danger plaintiff would commit suicide if she did not obtain partial custody of Michael.

In orally ruling on the dispute the trial court found both parties to be intelligent, fit, and loving parents. He stated he had no substantial concern about plaintiff's future fitness, though he did express some concern in this area. After noting that the decision was extremely difficult and was a very close case the judge stated:

"* * * I believe that in this case that the evidence would show that the mother is rigid, is inflexible, has and will take unilateral action regarding the child's future. And I would believe there are examples of that, the baptismal, the statement in two letters regarding the fact that the child is now a Catholic, the fact that she made a determination that the Catholic schools are better. I personally do not believe that there was sufficient knowledge available to her or that she made herself—made available to her to make that decision.

I don't believe—I am sorry—I am not concerned with which or what religious beliefs are part of either parent. I am not concerned with which faith the child is raised. I don't believe that's my function. I don't believe that impacts upon one being better than the other. I clearly don't have an ability to determine which faith is better or if any faith is better. But what I am concerned about is that the child be free to choose and that the child have the right to the guidance of each parent and that both parents respect the rights of that child to the input of the other parent."

I.

Appellant's first contention is that this cause must be reversed for failure of the trial court to make certain jurisdictional findings required by the governing statute. Section 610(b) of the Illinois Marriage and Dissolution of Marriage Act (Ill. Rev. Stat. 1977, ch. 40, pars. 101 through 802, hereinafter the Act) states:

"(b) The court shall not modify a prior custody judgment unless it finds, upon the basis of facts that have arisen since the prior judgment or that were unknown to the court at the time of entry of the prior judgment, that a change has occurred in the circumstances of the child or his custodian and that the modification is necessary to serve the best interest of the child. In applying these standards the court shall retain the custodian appointed pursuant to the prior judgment unless:

(1) the custodian agrees to the modification;

(2) the child has been integrated into the family of the petitioner with consent of the custodian; or

(3) the child's present environment endangers seriously his physical, mental, moral or emotional health and the harm likely to be caused by a change of environment is outweighed by its advantages to him." (Ill. Rev. Stat. 1977, ch. 40, par. 610(b).)

In *In re Custody of Harne* (1979), 77 Ill. 2d 414, 396 N.E.2d 499, our supreme court held, with respect to an order modifying a prior custody decree so as to shift custody from one parent to another, that explicit findings by the trial court on points (1), (2) or (3) were indispensable requirements of the statute. Upon examination of the rationale of that decision and the language of the statute we find the requirement of those findings to be inapplicable to this cause. The court in *Harne* made clear that its holding was intended to bolster the underlying policies favoring finality of child-custody judgments and creating a presumption in favor of the present custodian so as to promote stability and continuity in the child's relationships and environment. But in this cause there is no custodian who could logically benefit from such a presumption. Both parents had been awarded custody, each for six months. Both parents agreed that because of the onset of the child's school years a change in this arrangement was required to serve the best interest of the child. Thus the initial requirements of the statute, a change in the circumstances of the child requiring modification of custody, were indisputably established. The standards intended to protect the child's interest in stability and continuity by creating a presumption in favor of a single present custodian are inapplicable. Accordingly, we do not find that the trial court erred in failing to articulate one of the findings set out in the latter part of the statute.

## II.

■■ Appellant contends that the decision of the trial court was contrary to the manifest weight of the evidence. She focuses on three factors: denial of custody of a young child to its mother, the fact that defendant works full-time, and defendant's relationship with the woman in San Francisco. Although claiming not to rely on such a presumption, appellant cites cases invoking the tender years doctrine which establishes a preference or presumption in favor of maternal custody for young children. (*Nye v. Nye* (1952), 411 Ill. 408, 105 N.E.2d 300; *Meyers v. Meyers* (1977), 51 Ill. App. 3d 830, 366 N.E.2d 1114.) We believe that this presumption, first invoked in this State in 1849 (*Miner v. Miner* (1849), 11 Ill. 43), to defeat the common law presumption in favor of the father (see Schiller, *Child Custody: Evolution of Current Criteria* (1977), 26 De Paul L. Rev. 241), is

no longer the law. *In re Marriage of Sieck* (1979), 78 Ill. App. 3d 204, 396 N.E.2d 1214, and cases cited therein.

● 2 Certainly one factor the court may consider is the effect of a parent's work schedule on the ability to care for the child. (See *Kauffman v. Kauffman* (1975), 30 Ill. App. 3d 159, 333 N.E.2d 695.) But the fact that one parent must work outside the home is not controlling, especially when the child at issue has reached school age. As the court in *Drake v. Hohimer* (1976), 35 Ill. App. 3d 529, 531, 341 N.E.2d 399, 401 noted:

> "Plaintiff argues that because the father is at work all day, and she is not, she should have been awarded the custody. This factor may be a strong consideration in a case in which children are of preschool age, but it is less important when children attend school for the greater part of the day. Here, one child is in third grade and the other will be starting first grade in a short time. With both children in school, the need for a parent to be in the home during the day is greatly reduced. We are unable to say that the trial court abused its discretion in awarding custody to the father, even though he will not be at home during the day."

In this cause there was no evidence indicating that defendant's work schedule had previously been detrimental to the interests of his child. And the fact that Michael would be starting school in the fall lessens even more the impact of that factor.

■■ The final factor cited by appellant is the defendant's relationship with a woman in San Francisco. They rely on three cases in which Illinois courts have pointed to the illegal sexual relationship of one party as support for the trial court's exercise of discretion in awarding custody to the other parent. (*Jarrett v. Jarrett* (1979), 78 Ill. 2d 337, 400 N.E.2d 421; *Gehn v. Gehn* (1977), 51 Ill. App. 3d 946, 367 N.E.2d 508; *De Franco v. De Franco* (1979), 67 Ill. App. 3d 760, 384 N.E.2d 997.) In this cause the trial court's decision is asserted to be contrary to the manifest weight of the evidence, in part because of a parent's sexual conduct. We find the conduct at issue not to be comparable to the conduct condemned in the cases cited by appellant. In *DeFranco* the mother was cohabiting in Illinois with a married man. She was using support money intended for her children to support him. The father objected to this behavior from a moral standpoint, and there was credible evidence that one of the children had become upset and high-strung as the result of the mother's actions. In *Gehn* the mother's sexual relationship with a married man was demonstrated to have resulted in the neglect of her children. She would leave them on numerous evenings in the care of her 12-year-old daughter so that she could be with the man. She once left one of her children in the hospital in order to travel with the man to a farm 200 miles away. Two of her children were aware that she had become pregnant by the man. In

*Jarrett* no such direct harm was demonstrated. But that court held that the mother's continued open and notorious cohabitation, in derogation of Illinois public policy as established by the continued existence of criminal statutes prohibiting such behavior, endangered her children's moral development. In *Jarrett* the husband had testified that he believed the mother's behavior to have created an improper environment for his children. In this cause there was no evidence adduced that plaintiff objected to defendant's relationship with the woman. Indeed, although plaintiff's counsel had adduced some of the evidence relating to this behavior he did not argue to the court that this was a factor to be considered in awarding custody. And counsel for the child informed the court that although he had reservations about this behavior and believed the mother should be awarded custody, he did not believe the father to be unfit. He stated that he believed the father had done a wonderful fathering job. The behavior at issue did not contravene any of the laws of California (see *In re Lane* (1962), 58 Cal. 2d 99, 372 P.2d 897, 22 Cal. Rptr. 857), nor was there evidence that it was open and notorious. Certainly there was no affirmative evidence of harm to the child as there was in *Gehn* and *DeFranco*. The majority in *Jarrett* stated that they were not enunciating a rule of mechanical denial of custody upon a showing of a violation of community standards. In this cause, upon consideration of the behavior at issue in the context of all the evidence adduced at trial, we do not find that the trial court erred in granting defendant custody despite that behavior.

## III.

■■ At trial and on appeal appellant has asserted that the trial court improperly permitted evidence to be adduced which related to plaintiff's fitness prior to the California divorce decree. They contend that the prior decree should be *res judicata* insofar as plaintiff's prior fitness for custody is concerned. The simple answer to this contention is that such evidence is statutorily permitted. Section 610(b) of the Act provides that a custody modification order is to be based upon facts that have arisen since the prior judgment *or that were unknown to the court at the time of the entry of the prior judgment*. Accordingly, where it is established that such evidence was not previously considered, it may be raised as relevant to the child's best interests and to the issue of a change in circumstances. (*Boggs v. Boggs* (1978), 65 Ill. App. 3d 965, 383 N.E.2d 9.) It has also been held that where the parties previously agreed *inter se* to the original custody decree the trial court may exercise initial discretion in determining the need for a change in custody. (*Boggs; McDonald v. McDonald* (1973), 13 Ill. App. 3d 87, 299 N.E.2d 787; see *Valencia v. Valencia* (1978), 71 Ill. 2d 220, 375 N.E.2d 98.) In this cause defendant

testified that in the short California hearing resulting in the original decree the question of plaintiff's fitness for custody was not raised. And although there was no direct evidence that plaintiff had specifically agreed to that custody disposition, it is clear that she did not appear to contest it. Accordingly, we find no error in the determination of the trial court that evidence relating to plaintiff's fitness for custody prior to the original decree was admissible. It should be noted that the psychiatrists presented by both parties utilized this evidence in arriving at their conclusions concerning the plaintiff's fitness for custody at the time of the hearing.

## IV.

Section 602 of the Act states:

"§602. Best interest of child. (a) The court shall determine custody in accordance with the best interest of the child. The court shall consider all relevant factors including:

(1) the wishes of the child's parent or parents as to his custody;

(2) the wishes of the child as to his custodian;

(3) the interaction and interrelationship of the child with his parent or parents, his siblings and any other person who may significantly affect the child's best interest;

(4) the child's adjustment to his home, school and community; and

(5) the mental and physical health of all individuals involved.

(b) The court shall not consider conduct of a present or proposed custodian that does not affect his relationship to the child." (Ill. Rev. Stat. 1977, ch. 40, par. 602.)

Michael's attorney suggests that the trial court failed to apply these criteria in rendering its order. It is manifest from our review of the trial testimony that the court was presented with testimony relating to these factors. The fact that the court did not explicitly explore its conclusions as to each factor in issuing its order does not establish that the criteria were not utilized. (See *In re Marriage of Atkinson* (1980), 82 Ill. App. 3d 617, 402 N.E.2d 831.) Indeed, it is clear that this list of criteria was not intended to be exhaustive or necessarily controlling. The commissioners' note to section 402 of the Uniform Marriage and Divorce Act, the equivalent of our section 602, states in part:

"This section * * * is designed to codify existing law in most jurisdictions. It simply states that the trial court must look to a variety of factors to determine what is the child's best interest. The five factors mentioned specifically are those most commonly relied upon in the appellate opinions; but the language of the section makes it clear that the judge need not be limited to the factors specified." (9A Uniform Laws Annotated 198 (1979).)

Michael's attorney specifically contends that the court failed to consider his recommendation as to the custody question. As we have noted this recommendation was for custody in plaintiff, but it was not presented in absolute terms. Counsel indicated that he had a difficult time deciding on his recommendation. Under these circumstances we do not deem the ultimate rejection of this advice by the court to constitute proof that the advice was ignored.

## V.

We have cited at length the conclusions reached by the trial court in awarding custody as it did. It is clear that this was not any easy question for the court. It found that both parties were fit and able parents, but by agreement of all parties it was necessary to modify the prior custodial arrangement. In exercising its discretion on the issue the trial court found the balance to be tipped by some concern for the plaintiff's future emotional fitness, but more importantly by a judgment that she had displayed a tendency to make rigid unilateral decisions concerning the child without adequate deliberation or consultation. Because of the apparent conflict between the parties in the past as to the religious upbringing of their child these decisions happened to involve to some extent religious matters. But the trial court emphasized that it was not determining the validity of the choices made, only the manner in which they were made. We thus find no merit in the claim of Michael's counsel that this represented an improper consideration of religious issues by the court. Counsel also notes that by statute the custodial parent in the future would have the authority to make unilateral decisions concerning issues such as religion. Section 608(a) of the Act provides:

> "(a) Except as otherwise agreed by the parties in writing at the time of the custody judgment, the custodian may determine the child's upbringing, including but not limited to, his education, health care and religious training, unless the court, after hearing, finds, upon motion by the noncustodial parent, that the absence of a specific limitation of the custodian's authority would endanger the child's physical health or significantly impair his emotional development." (Ill. Rev. Stat. 1977, ch. 40, par. 608(a).)

But this ignores the fact that the plaintiff made such unilateral, and apparently secretive decisions at a time when the defendant also had custody and thus was entitled to share in the decisions. We do not suggest, nor did the trial court, that this behavior rendered plaintiff unfit. But the court properly took this into account in determining which of two fit parents would best serve the interests of the child. The discretion afforded the trial court in such matters is such that a reviewing court will not disturb its decision unless it was against the manifest weight of the

evidence or manifest injustice will result. (*DeFranco v. DeFranco* (1979), 67 Ill. App. 3d 760, 384 N.E.2d 997; *Murphy v. Murphy* (1975), 31 Ill. App. 3d 321, 334 N.E.2d 779.) We find no abuse of discretion and accordingly affirm the judgment of the trial court.

Affirmed.

LINN, P. J., and JOHNSON, J., concur.