**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

2022 IL App (3d) 220048-U

Order filed July 1, 2022

_____

IN THE

APPELLATE COURT OF ILLINOIS

THIRD DISTRICT

2022

| | | |
|---|---|---|
| BENJAMIN D. FOGLE, | ) | Appeal from the Circuit Court |
| | ) | of the 13th Judicial Circuit, |
| Petitioner-Appellee, | ) | La Salle County, Illinois |
| | ) | |
| | ) | Appeal No. 3-22-0048 |
| v. | ) | Circuit No. 18-F-207 |
| | ) | 18-F-269 |
| | ) | |
| JESSICA BEZELY, | ) | Honorable |
| | ) | Karen C. Eiten, |
| Respondent-Appellant. | ) | Judge, Presiding |

_____

PRESIDING JUSTICE O'BRIEN delivered the judgment of the court.
Justices Hauptman and McDade concurred in the judgment.

_____

**ORDER**

¶ 1     *Held*:   Trial court did not err when it granted father's motion to modify allocation of parenting plan and named father primary residential parent.

¶ 2     The trial court modified the parties parental responsibility and parenting plan, finding it was in their child's best interests that primary residential custody be awarded to the father. Mother appealed. We affirm.

¶ 3                                 I. BACKGROUND

¶ 4    Petitioner Benjamin D. Fogle and respondent Jessica Bezely share a child, G.F., who was born on May 29, 2017. The parties lived together for a period of time in La Salle County but were never married. After they "split up," Jessica, G.F. and Jessica's two sons moved into a local shelter and in November 2018, they moved to Quincy, Illinois. Benjamin and Jessica agreed to an allocation of parental responsibility and parenting plan which was entered by the court. Pursuant to the plan, the parties had parenting time alternating weeks from Friday to Friday. The parties exchanged G.F. at a location approximately halfway between their houses, which was a distance of 200 miles. Jessica's address was designated as G.F.'s residential address solely for school enrollment purposes. Benjamin was ordered to pay $300 per month in child support.

¶ 5    In July 2020, Benjamin filed an emergency order of protection against Jessica's boyfriend, Trenton Musick, on behalf of G.F., alleging that Musick inappropriately touched G.F. The order of protection was extended but ultimately dismissed for lack of prosecution. In August 2020, Jessica filed a petition for rule to show cause, alleging that Benjamin failed to allow her parenting time. The trial court entered orders in September 2020 regarding the parties' agreement to reinstate Jessica's parenting time, dismissing the petition for rule to show cause, and modifying the allocation judgment to prevent Musick from taking G.F. to the bathroom, dressing or bathing her and barring him from being alone with her. The order also barred Kurt Fogle, G.F.'s paternal grandfather, from being alone with G.F. The same month, Benjamin filed a motion to modify allocation of parental responsibilities and parenting plan.

¶ 6    A trial took place in October 2021. Benjamin testified. He was married in May 2021 and lived with his wife Macy, their daughter Vada, who was born in July 2021, and G.F. He bought a three-bedroom house in Cedar Point in La Salle County in 2019, located on a dead-end street with a big yard. G.F. had her own bedroom. He practiced a structured life and spent all his time on his

2

days off with G.F. He lived for his family. He was employed as an operator and worked 12-hour shifts from 7 a.m. to 7 p.m. with an alternating schedule of shifts on Monday and Tuesday, days off on Wednesday and Thursday, then working again on Friday, Saturday, and Sunday. The schedule reversed the next week, which would generally be the week G.F. was with him, when he worked Wednesday and Thursday and was off Monday, Tuesday, and Friday through Sunday. When he worked, G.F. was home with Macy, who did not work outside the home.

¶ 7 Macy Fogle testified that she was married to Benjamin and they have a daughter together. She assisted Benjamin in caring for G.F. When he was at work, she was G.F.'s primary caretaker and had no issues with her role. She described G.F's general daily routine, which included arts and crafts and outdoor time. They ate at home as a family and engaged in family activities, such as hiking and visiting their extended families. They had dinner with Benjamin's parents a couple of times a month and they provided a support system. G.F. asked to spend time with her grandparents. Macy explained their family life was structured with the aim to provide stability for G.F. and Vada. She characterized her role as a stepmother to teach G.F. to become a kind, responsible, loving adult. During the weeks when G.F. was not with her and Benjamin, it felt like something was missing in the home. She felt good about G.F. spending the majority of time with her, Benjamin and Vada, and she would provide G.F.'s school transportation and be involved in school activities. On cross-examination, Macy explained that after Benjamin returned home from work around 7:30 p.m., they all participated in family time until G.F. prepared for bed around 8 p.m. They usually ate dinner or played a game together.

¶ 8 Kurt Fogle testified. He played with G.F. along with G.F.'s grandmother, Rhonda. G.F. enjoyed princess things. On occasion, he and Rhonda babysat G.F. for Benjamin and Macy. He provided support for Benjamin when needed, such as transporting G.F. to the exchanges with her

mother. He would attend G.F.'s activities if she went to school in Oglesby but would have to align his work schedule if G.F. went to school in Quincy, where Jessica lived, to be able to attend events there. On cross-examination, he acknowledged a report filed against him with the Department of Children and Family Services (DCFS) which accused him of inappropriately touching G.F. and another report that he inappropriately touched his niece in the 1990s. Both reports were deemed unfounded. He described how Benjamin and Macy disciplined G.F., which was structured and positive.

¶ 9        Rhonda Fogle testified. She was G.F.'s paternal grandmother. She helped Benjamin a lot with G.F. when he was single and she had a strong bond with her granddaughter. She and G.F. baked together and went to the pool. G.F. liked to help Rhonda in the garden. They have a tire horse and trampoline in the yard for G.F. She tried to engage in activities with G.F. at least once a week when G.F. was with Benjamin and Macy. When G.F. spent the night, she slept with Rhonda in her room. Rhonda would attend her activities if she attended school in Oglesby but might not be able to if G.F. attended school in Quincy.

¶ 10        Jessica testified. She had three children: Emmet, Haagen and G.F. She described an off-again, on-again relationship with Benjamin, stating that he "kicked" her and the children out of the house several times. They "split up" as a couple in September 2018. Jessica described two incidents of alleged domestic violence perpetrated against her by Benjamin in G.F.'s presence but acknowledged she did not call the police regarding the incidents. She moved to a domestic violence shelter and then moved to Quincy in November 2018. She initially lived with Haagen's father and his wife, but in February 2019 she moved into a duplex provided by the YMCA for victims of domestic violence. The duplex had three bedrooms and G.F. shared a room with one of her half-brothers. Jessica was soon going to start tutoring at the community college she was attending full

4

time. The job was for 3½ hours per week and provided day care. Jessica received child support from Benjamin and insured G.F. through the state. She believed she and Benjamin could co-parent. In her community in Quincy, there were a lot of other children and church activities. They attended church twice a week. G.F. was enrolled in preschool in Quincy and doing well. She informed Benjamin of the school app where he could access information but he would not use it. When G.F. returned from her father's home, her behavior was very erratic for a few days. G.F. told Jessica that her paternal grandfather tickled her privates.

¶ 11    On cross-examination, Jessica said she was last employed in November 2019. When she first moved to Quincy, she lived with her three children in a four-bedroom trailer with Haagen's father and his wife. Since 2017, she lived in six different residences. She moved to Quincy to keep Benjamin away from G.F. She acknowledged she owed money to collection agencies and had been arrested for speeding. In 2016, she was evicted and was also charged with truancy regarding Emmet, and in 2018, she violated the child restraint law. Emmet was suspended from school for hitting people. G.F. was first enrolled in preschool in Oglesby until Jessica enrolled her in preschool in Quincy.

¶ 12    Jessica exercised four or five days a week at the YMCA. G.F. was either in preschool or with Jessica during those times. She did not allow her children to eat junk food and she kept her refrigerator door locked because G.F. would take food and leave it around the house. She does not allow her children to eat freely. She does not use drugs or alcohol. She admitted a text message she meant to send to Haagen's father but sent to Benjamin stated: "Heyyyyy! I have a better idea than a double date actually this was Trents idea—he said instead of going on a date we'll all work children free at the trailer and help get you guys moved in. We can all get really high and order food." She said she used cannabis gummies but stopped several months earlier. She used them per

5

her doctor's recommendation because she was diagnosed with fibromyalgia. She admitted using them while G.F. was present. In 2013, DCFS took custody of her two sons because her boyfriend was abusing her and she continued to date the abuser. She was charged with misdemeanor domestic violence against Benjamin in 2017 when she "busted" his eyebrow open. Benjamin was holding G.F. when she hit him. She was indicated by DCFS for substantial risk of physical injury and providing an environment injurious to G.F.'s health and welfare by neglect.

¶ 13    Jessica had a good relationship with her mother, who lived in La Salle. She did not talk to her sister, who lived in Spring Valley. Her brother was in the Illinois Department of Corrections. She took her sons and G.F. to day care at times when she was not working so she could have some alone time. For two weeks during the month, only her son Emmet was with her. She had no family in Quincy and it was very hard to care for her children. She drove a 2001 vehicle with 133,000 miles. Benjamin's parents gave her a van but she was fixing it up to give it to the neighbor.

¶ 14    Christine Stevens testified. She was a social worker and assisted Jessica with child care. She described that G.F. had a healthy relationship with Jessica. She never saw Jessica withhold food. She observed that G.F. would be clinging to Jessica after she returned from Benjamin's house and she would be angry and acting out. G.F. would become calmer after spending time with Jessica. Stevens was not licensed by the state as a social worker.

¶ 15    Benjamin Burton testified. He shared a child, Haagen, with Jessica. Haagen was born in December 2011 and he and Jessica successfully co-parent him.

¶ 16    Wanda Cassidy, a friend of Jessica, testified to Benjamin's harassing behavior at the exchange of G.F. that morning. On cross-examination, Cassidy said Jessica's vehicle had broken down and Cassidy drove her to court.

¶ 17    Benjamin testified in rebuttal that he never "kicked" Jessica, her sons, and G.F. out of the house and denied that he ever engaged in domestic violence against Jessica.

¶ 18    Following the trial, the trial court granted Benjamin's motion and awarded primary residential custody to him. The trial court found the majority of statutory factors did not favor either parent but several favored Benjamin and none favored Jessica. The court concluded that G.F. was provided a more structured environment while in her father's care, that Jessica engaged in domestic violence against Benjamin, and that Benjamin placed the needs of G.F. above his own while Jessica's conduct failed to establish that she placed the child's needs first. The court further noted the credible abuse allegations against Jessica's boyfriend and that her allegations against Benjamin's father were not credible. It eliminated the restrictions preventing Kurt Fogle from being alone with G.F., finding Jessica's allegations were not credible. The court imputed income to Jessica and ordered her to pay $166 per month in child support.

¶ 19    Jessica moved to reconsider, which motion the trial court heard and denied. The court specifically found, in relevant part, that it was not true Jessica spent all her time with G.F. while the child was in her care. According to the court, if Jessica was constantly monitoring G.F., locks on the refrigerator would not have been necessary. It noted Jessica had credibility problems. She timely appealed the trial court's modification of residential custody and the denial of her motion to reconsider.

¶ 20    II. ANALYSIS

¶ 21    The sole issue on appeal is whether the trial court erred when it modified custody to name Benjamin the primary residential parent. Jessica argues the modification was not in G.F.'s best interests. She challenges only the trial court's findings that the amount of caretaking the parent did in the prior two years did not favor either party. According to Jessica, she was 100% responsible

7

for G.F.'s care during some of that time period such that the trial court should have found the factor favored her.

¶ 22    A parent may petition the court to modify parenting time when a significant change in a child's circumstances occurs and the modification serves the child's best interests. 750 ILCS 5/610.5(a) (West 2018). In determining an allocation of parenting time that is in the child's best interests, the court considers the following factors:

"(1) the wishes of each parent seeking parenting time;

(2) the wishes of the child, taking into account the child's maturity and ability to express reasoned and independent preferences as to parenting time;

(3) the amount of time each parent spent performing caretaking functions with respect to the child in the 24 months preceding the filing of any petition for allocation of parental responsibilities or, if the child is under 2 years of age, since the child's birth;

(4) any prior agreement or course of conduct between the parents relating to caretaking functions with respect to the child;

(5) the interaction and interrelationship of the child with his or her parents and siblings and with any other person who may significantly affect the child's best interests;

(6) the child's adjustment to his or her home, school, and community;

(7) the mental and physical health of all individuals involved;

(8) the child's needs;

(9) the distance between the parents' residences, the cost and difficulty of transporting the child, each parent's and the child's daily schedules, and the ability of the parents to cooperate in the arrangement;

8

(10) whether a restriction on parenting time is appropriate;

(11) the physical violence or threat of physical violence by the child's parent directed against the child or other member of the child's household;

(12) the willingness and ability of each parent to place the needs of the child ahead of his or her own needs;

(13) the willingness and ability of each parent to facilitate and encourage a close and continuing relationship between the other parent and the child;

(14) the occurrence of abuse against the child or other member of the child's household;

* * *

(17) any other factor that the court expressly finds to be relevant." 750 ILCS 5/602.7 (West 2018).

¶ 23    The trial court evaluates the statutory factors to determine the child's best interests. *In re Custody of G.L.*, 2017 IL App (1st) 163171, ¶ 42. The court must consider all the applicable factors but is not required to make explicit findings as to each one. *Id.* ¶ 43. The court may consider a parent's work schedule and its effect on his ability to care for his child but the fact that a parent works outside the home should not control, especially when the child is in school. *Blonsky v. Blonsky*, 84 Ill. App. 3d 810, 818 (1980). We will not disturb a trial court's decision on allocation of parenting time unless it is against the manifest weight of the evidence, manifestly unjust, or resulted from an abuse of discretion. *Jameson v. Williams*, 2020 IL App (3d) 200048, ¶ 53 (citing *In re Marriage of Whitehead*, 2018 IL App (5th) 170380, ¶ 21. "A judgment is against the manifest weight of the evidence only if an opposite conclusion is apparent or if the findings appear

9

unreasonable, arbitrary, or not based on the evidence." *Whitehead*, 2018 IL App (5th) 170380, ¶ 21.

¶ 24     The parties do not dispute that a change of circumstances supported modification of their parenting plan. G.F. was approaching school age and the 200-mile distance between the parents' residences made their current shared custody plan unmanageable once G.F. began school. As stated above, the trial court did not find any factors favored Jessica and found the following factors favored Benjamin: the interaction and interrelationship of the child with her parents, siblings and other significant people, the child's needs, physical violence or the threat of it by the parent directed against the child or another household member, each parent's willingness to place the child's needs above his or her own, and the occurrence of abuse. The court determined that the majority of factors favored neither Benjamin nor Jessica, including the amount of time each parent spent performing caretaking duties.

¶ 25     Jessica argues that the trial court erred in finding the factor regarding caretaking time did not favor either party and that the court should have found it favored her in that she spends nearly all her time with G.F. when the child is in her care while Benjamin leaves G.F. with caretakers while he works. Benjamin worked 12-hour shifts with an alternating work schedule. While he worked, G.F. was cared for by her stepmother, Macy, who also cared for Vada, G.F.'s half-sister. Macy opted not to return to work after maternity leave so that she could stay home with both children while Benjamin worked outside the home. Both Benjamin and Macy testified that Benjamin spent his nonworking time with G.F. and the rest of the family. He described the evening and bedtime routine he had with G.F., including helping her prepare for bed and reading her a story. Macy testified that the family ate dinner together when feasible and participated in various

activities as a family. Kurt and Rhonda, G.F.'s paternal grandparents, testified to their son's relationship with G.F. and their role in helping raise their granddaughter.

¶ 26 Jessica testified that she spent the majority of her time with G.F. when the child was in her care. Jessica had not been employed since 2019 although she was anticipating starting a job offering her 3½ hours of work per week with day care provided for G.F. Despite Jessica's claims of personally caring for G.F., she acknowledged that she used a babysitter when she attended the gym four or five days a week to exercise and when she needed some quiet time to herself.

¶ 27 The trial court expressly found that both parents "provided care for the child during their respective parenting time" and that the factor favored neither party. The court recognized that caretaking responsibilities include providing financially and that each parent provided for G.F.: Benjamin did so through employment while Jessica took advantage of subsidized housing and other amenities she obtained without working. We agree with the trial court that Benjamin should not be punished for pursuing employment because he works outside the home. During his work shifts, G.F. remains in the care of her stepmother, or on occasions, in her grandparents' care. Similarly, the court did not punish Jessica for being unemployed but did note that Jessica also left G.F. in the care of others despite her lack of employment. Indeed, Stevens testified that she met Jessica in her role as a "single parent advocate" who helps parents with day care and she continued to provide day care for Jessica.

¶ 28 We find the trial court properly found that the amount of time each parent spent with caretaking functions did not favor either party. The record supports that both Benjamin and Jessica provided care, financial and otherwise, for G.F. in their own fashion. Contrary to Jessica's assertions, she did not spend nearly all of her time with G.F. when the child was in her care and the trial court expressly found Jessica was not credible as to this assertion. Both parents used others

11

to provide child care for G.F. The court found Benjamin provided a more structured environment for G.F. and the record supports its finding. Jessica does not challenge the trial court's assessment of the other best interests factors, which we determine also supports the court's conclusions. Accordingly, we conclude that the trial court did not err in awarding primary residential custody of G.F. to Benjamin.

¶ 29                                       III. CONCLUSION

¶ 30        For the foregoing reasons, the judgment of the circuit court of La Salle County is affirmed.

¶ 31        Affirmed.